**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HANNAH DAVID, Individually and on behalf of her minor daughter B.D.,
  *Plaintiff-Appellee*,

v.

GINA KAULUKUKUI,
  *Defendant-Appellant*,

and

CATHY BETTS, Director of the Department of Human Resources, State of Hawaii; AIMEE LESKOVIC; SHAWN LATHROP; IWALANI KAAUWAI-HERROD; PENNY CHO; DINO ST. AUGUSTINE; WILLIAM KEAHIOLALO; SHAYLENE ISERI; DOES, Jane and/or John Does 1–25; Doe Entities 1–10,
  *Defendants*.

No. 21-15731

D.C. No.
1:20-cv-00002-
JMS-WRP

OPINION

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, Chief District Judge, Presiding

Argued and Submitted February 15, 2022
Honolulu, Hawaii

Filed June 27, 2022

Before:  Michael Daly Hawkins, Ryan D. Nelson, and
Danielle J. Forrest, Circuit Judges.

Opinion by Judge Forrest

**SUMMARY**[*]

**Civil Rights**

The panel affirmed the district court's denial of defendant's motion to dismiss, on the basis of qualified immunity, an action brought pursuant to 42 U.S.C. § 1983 alleging violations of plaintiff's right to familial association.

Plaintiff, individually and on behalf of her minor daughter, alleged that defendant Gina Kaulukukui, an employee of the Kauai County Police Department, deceived the Hawaii family court when she assisted the non-custodial father of plaintiff's daughter in obtaining a temporary restraining order that prevented plaintiff, the sole custodial parent, from having any contact with her daughter. Plaintiff further alleged that Kaulukukui conspired with the non-custodial father and state officials to extract the daughter from her school and place her in the father's custody without plaintiff's knowledge or a court order.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel stated that although Kaulukukui may ultimately prove that plaintiff's allegations were false, at the pleading stage, the panel must accept all well-pleaded factual allegations as true. When the alleged events in this case occurred, the law clearly established that a parent and child's constitutional right to familial association is violated when a state official interferes with a parent's lawful custody through judicial deception. The law also clearly established that a state official cannot remove a child from a lawful custodial parent without consent or a court order unless the official has reasonable cause to believe that the child is in imminent danger and, even then, the scope and duration of the removal must be reasonable. Here, plaintiff plausibly alleged that Kaulukukui violated these rights by deliberately failing to inform the family court of a custody order when assisting the non-custodial father in obtaining a temporary restraining order that prevented contact between plaintiff and her daughter, and by assisting the other defendants in removing plaintiff's daughter from plaintiff's custody and separating them for 21 days. As such, Kaulukukui was not entitled qualified immunity at this early stage.

---

### COUNSEL

Charles A. Foster (argued), Office of the County Attorney, Lihue, Hawaii, for Defendant-Appellant.

Kevin A. Yolken (argued), Eric A. Seitz, and Jonathan M.F. Loo, Honolulu, Hawaii, for Plaintiff-Appellee.

**OPINION**

FORREST, Circuit Judge:

If what Plaintiff Hannah David alleges is true, she and her daughter suffered a blatant abuse of government power. David claims that Defendant Gina Kaulukukui, an employee of the Kauai County Police Department, deceived the Hawaii family court when she assisted the non-custodial father of David's daughter in obtaining a temporary restraining order (TRO) that prevented David, the sole custodial parent, from having any contact with her daughter. David further claims that Kaulukukui conspired with the father (who works for the Kauai County Fire Department) and other state officials to extract the daughter from her school and place her in the father's custody on a different island—all without David's knowledge or a court order—and then prevented David and her daughter from having any contact for 21 days.

Whether these shocking allegations are true is for another day. The question here is whether qualified immunity requires dismissal of David's denial-of-familial-association claim brought against Kaulukukui under 42 U.S.C. § 1983. Because we conclude that David and her daughter's constitutional right to familial association was clearly established such that a reasonable official in Kaulukukui's shoes would have understood that her alleged actions were a constitutional violation, we affirm the district court's denial of Kaulukukui's motion to dismiss. David and her daughter deserve nothing less than the opportunity to have their claims heard.

## I.  BACKGROUND

As this appeal comes to us from a denial of Kaulukukui's motion to dismiss, we must "accept[] as true all well-pleaded allegations of material fact, and construe[] them in the light most favorable to [David]." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018) (quoting *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012)).

### A.  Family Background and Custody Order

David is the mother and sole custodial parent of her 11-year-old daughter, B.D. William Keahiolalo is B.D.'s biological father. David alleges that Keahiolalo raped and impregnated her when she was underage. David reported the alleged rape, but no criminal charges were filed against Keahiolalo. Shortly after B.D.'s birth, David alleged that Keahiolalo abused B.D. In the wake of these serious allegations, the parties engaged in "prolonged and bitter litigation in the Family Court," and "[i]n order to avoid an evidentiary hearing on the custody and abuse allegations," Keahiolalo "agreed to stipulate to any and all of [David]'s demands with regard to the custody of B.D."

In 2012, the parties filed a stipulated custody agreement with the Hawaii family court, and the court issued an order granting David full legal and physical custody of B.D. (Custody Order). The Custody Order denied Keahiolalo visitation rights and ordered that he "stay away from and have no contacts whatsoever with [David]."[1] The Custody Order also contained a provision stating that "in the absence

---

[1] David alleges that the Custody Order also prohibits Keahiolalo from having contact with B.D., but the district court noted that the redacted version of the Order appears to prohibit contact only with David.

of a compelling emergency that affects [B.D.'s] health or safety, Mr. Keahiolalo stipulates and agrees not to file any motions in the Family Court of the State of Hawaii or another jurisdiction." The Custody Order "has never been amended, modified, or vacated, and remains in full force and effect."

## B.  Altercation and TRO

During the relevant period, David and B.D. lived on the island of Hawaii, while Keahiolalo lived on Kauai. From issuance of the Custody Order until November 2019, Keahiolalo had "virtually no contacts" with his daughter. However, in November 2019, David and B.D. flew to Kauai for Thanksgiving to visit David's family. While there, B.D. participated in a modeling show at a local shopping center. Keahiolalo showed up at this event with two of his other daughters and introduced himself to B.D. David ordered to him leave, but he "continued to follow [David] and B.D., encouraged his daughters to approach B.D., and videotaped the children's reaction."

The following day, David took B.D. to Keahiolalo's workplace and demanded that he apologize to B.D. When he refused, David yelled at, pushed, and taunted Keahiolalo until the police arrived and arrested her on misdemeanor harassment and third-degree assault charges. After David posted bail, she and B.D. returned to the island of Hawaii.

A few days after the altercation, Keahiolalo met with Kaulukukui at the Kauai County Police Department. Kaulukukui prepared and filed a petition for a protective order (the Petition) in the Hawaii family court on Keahiolalo's behalf seeking to prohibit David from contacting Keahiolalo or any of his family members, *including B.D.* The Petition did not mention the existing

Custody Order or inform the family court that Keahiolalo lacked legal, custodial, or visitation rights to B.D.

On December 4, 2019, the family court granted the Petition and issued a TRO prohibiting David from having contact with B.D. or Keahiolalo. The TRO did not discuss any custodial issues or authorize Keahiolalo to take custody of B.D.

### C. State Officials Place B.D. with Keahiolalo

Approximately two weeks after Keahiolalo received the TRO, a Hawaii Child Welfare Services (CWS) official visited David's home and performed a Comprehensive Strengths and Risk Assessment Rating to determine whether the home was safe for B.D. David received a risk score of 3 on a scale of 0–51, with a low/moderately low risk score ranging from 1 to 17. During the home visit, David explicitly informed the official of the terms of the Custody Order. Around this same time, at least two other CWS officials were also explicitly informed of the Custody Order.

Nevertheless, a few days after the home visit, on December 20, several CWS officials (accompanied by Keahiolalo and multiple state police officers) conducted a "grab and go" of B.D. without a court order or prior notice to David. State officials took B.D. from her school, placed her in Keahiolalo's custody, immediately escorted Keahiolalo and B.D. to the airport, and flew them to Kauai "to avoid any encounter with [David]."

David was not informed that B.D. had been taken from school and transported to Kauai until after B.D. was placed in Keahiolalo's custody and police officers served the TRO on David at her home. David and her attorney attempted to contact CWS, the police, and the Kauai court to get

information about B.D.'s whereabouts, but they were unsuccessful. David again informed CWS of the terms of the existing Custody Order. David also reported to the Kauai County Police Department "that B.D. had been kidnapped and was in the custody of an allegedly abusive, non-custodial parent." But Kaulukukui and the other named defendants worked together to prevent David's allegations from being investigated or a police report from being filed.

Eleven days later, during which time David had no contact with her daughter, the family court held a hearing on the TRO. The court learned of the Custody Order for the first time and dismissed the prohibition against David having contact with B.D. due to Keahiolalo's "lack of authority . . . to file on behalf of [B.D.]." But the court declined to issue any additional orders and "directed counsel, as officers of the court, to discuss and work out the custody matters." Despite the court's direction, the Kauai County Prosecutor refused to (1) speak with David's counsel, (2) produce any authority permitting Keahiolalo to maintain physical custody, or (3) allow David or her mother to see or talk to B.D.

After the hearing, David's counsel repeatedly attempted to contact CWS representatives on the islands of Kauai and Hawaii and have B.D. returned to David or removed from Keahiolalo, all to no avail. CWS initially attempted to deny involvement in the seizure to make it appear that Keahiolalo "simply took custody of B.D. himself," but it later informed David that it would "be filing something" in the family court. Several days later, CWS removed B.D. from Keahiolalo's home and placed her in a foster home on Kauai, still without allowing David to communicate with her daughter.

Having made no progress working with state officials, on January 2, 2020, David moved for a TRO in federal

district court requiring the state to return B.D. to her custody. Four days later, the Hawaii Department of Human Services filed a petition for temporary custody of B.D. in the Hawaii family court. After an evidentiary hearing, the family court denied the Department's petition. Finally—21 days after being grabbed from her school without her mother's knowledge and without being able to even talk to her mother—B.D. was returned home.

### D. This Lawsuit

David, individually and on behalf of B.D., sued several individuals, including Kaulukukui, under 42 U.S.C. § 1983 for violating their constitutional right to familial association.[2] In addition to the facts included above, David alleged in her First Amended Complaint (FAC) that:

- Kaulukukui "acted in concert with [CWS officials], among others, to file and serve the [P]etition in the family court, to provide Defendant Keahiolalo with advice enabling him to obtain the protective order and thus circumvent the existing [Custody Order], and to orchestrate and carry out the seizure of B.D. and placement with Defendant Keahiolalo without any authority to do so."

- After the seizure of B.D. from her school, several Defendants, including Kaulukukui,

---

[2] While David named multiple CWS workers, the State Director of the Department of Human Services, Keahiolalo, and Keahiolalo's attorney as defendants, this appeal concerns only Kaulukukui because she is the only defendant who moved to dismiss asserting qualified immunity.

"were communicating amongst each other and acting in concert to prevent . . . [a] police report from being filed, to prevent [David's] claims from being investigated and to perpetuate what they knew to be the unlawful placement of B.D. in the custody of Defendant Keahiolalo."

- From December 2 to December 31, all Defendants, including Kaulukukui, "had frequent and direct contacts with Defendant Keahiolalo in the form of text messages, emails, phone conversations, and in-person visits – both formal and informal – in which Defendants worked together at every step with Defendant Keahiolalo to assist with and prepare documents that deliberately misled the Family Court, to conspire to orchestrate the 'grab and go' abduction of B.D., and to maintain the appearance that the actions taken were appropriate and lawful."

Kaulukukui moved to dismiss the claim brought against her based on qualified immunity. The district court denied her motion, concluding that David plausibly alleged that Kaulukukui violated a clearly established constitutional right to familial association. The district court first explained that the FAC could plausibly be read to infer that Kaulukukui knew about the Custody Order when she filed the Petition and, therefore, knew that Keahiolalo did not have any authority to move for a protective order on B.D.'s behalf. In addition, the district court held that the FAC stated several allegations that, after the Petition was filed, Kaulukukui "knowingly assisted in the wrongful removal of B.D. from

David's custody in violation of [their] rights to familial association." While the district court noted that Kaulukukui might ultimately be able to show that David's allegations were not true, it concluded that "those questions cannot be definitively answered at this motion-to-dismiss stage." Kaulukukui timely appealed.

## II.  DISCUSSION

We generally lack jurisdiction to hear interlocutory appeals from denials of a motion to dismiss. *See Hernandez*, 897 F.3d at 1132. However, there is an exception to this rule for denials based on qualified immunity. *Id.* This exception exists "because qualified immunity is immunity from suit, not just a defense to liability, and the immunity is effectively lost if a case is erroneously permitted to go to trial." *Andrews v. City of Henderson*, __ F.4th __ (9th Cir. 2022) (cleaned up). We review de novo a district court's denial of a motion to dismiss based on qualified immunity. *Benavidez v. County of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021). We "accept[] as true all well-pleaded allegations of material fact, and construe[] them in the light most favorable to the non-moving party." *Hernandez*, 897 F.3d at 1132 (quoting *Padilla*, 678 F.3d at 757). "If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go forward with their claims." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (quoting *Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865, 872 (9th Cir. 1992)).

Qualified immunity shields government officials from liability for civil damages unless their conduct "violated a clearly established constitutional right." *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022) (quoting *Monzon v. City of Murrieta*, 978 F.3d 1150, 1156 (9th Cir.

2020)). To determine whether an official is entitled to qualified immunity, the court asks "(1) whether the [official's] conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the events at issue." *Id.* (internal quotation marks citation omitted).

Kaulukukui does not dispute that David and her daughter have a constitutional right to familial association—nor could she. "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Keates*, 883 F.3d at 1235–36 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)). Our caselaw has long recognized this right for parents and children under the Fourth and Fourteenth Amendments. *See, e.g.*, *Keates*, 883 F.3d at 1235–38 (explaining the origins of the right); *Wallis v. Spencer*, 202 F.3d 1126, 1136–37 (9th Cir. 2000). For parents, the right to familial association is generally grounded in the Fourteenth Amendment's Due Process Clause, while claims brought by children are evaluated under the more "specific" Fourth Amendment right to be free from unreasonable seizures. *See Kirkpatrick v. County of Washoe*, 843 F.3d 784, 788–89 & n.2 (9th Cir. 2016) (en banc). However, "the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children." *Keates*, 883 F.3d at 1236 (quoting *Wallis*, 202 F.3d at 1137 n.8).

Kaulukukui instead argues that the violations that David alleges were not "clearly established" under the specific facts presented in this case. We disagree. A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right." *Rice v. Morehouse*, 989 F.3d 1112, 1125

(9th Cir. 2021) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Hardwick v. County of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017) (quoting *City & County of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015)). Although the "law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, __ U.S. __, 142 S. Ct. 4, 7–8 (2021) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 7–8 (2017)).

## A. The TRO Petition

David alleges that Kaulukukui violated her and B.D.'s right to familial association by helping Keahiolalo file the Petition asking the family court to prevent David from having any contact with B.D., despite knowing that the Custody Order severely limited Keahiolalo's rights related to B.D. Our caselaw clearly establishes that, as part of the right to familial association, parents and children have a "right to be free from judicial deception" in child custody proceedings and removal orders. *Greene v. Camreta*, 588 F.3d 1011, 1034 (9th Cir. 2009), *vacated in part on other grounds*, 563 U.S. 692 (2011), 661 F.3d 1201 (9th Cir. 2011). Indeed, we recently reiterated that by 2016, "well before" the events of this case, it was clearly established that "material omissions and misrepresentations with a deliberate disregard for the truth to a juvenile court would violate the Constitution." *Benavidez*, 993 F.3d at 1152; *see also Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1108 (9th Cir. 2010) ("[D]eliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause

of the Fourteenth Amendment when a liberty or property interest is at stake."); *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (describing as "virtually self-evident" the constitutional due process right to not be subjected to criminal charges based on deliberately false evidence).

In *Greene*, for example, the plaintiff alleged that her children were removed from her custody after a social worker intentionally included false statements in his petition for a protective custody order. 588 F.3d at 1018–19, 1034. We denied the social worker qualified immunity at summary judgment because, viewing the facts in the light most favorable to the plaintiff, the court would not have granted the order and the plaintiff would not have lost custody of her children absent the social worker's deliberately false statements. *Id.* at 1035–36. In doing so, we held that the right to be free from judicial deception in child custody proceedings was clearly established by our precedent, including numerous decisions in the Fourth Amendment context holding that officers who make false or misleading statements in an affidavit to a court are not entitled to qualified immunity. *Id.* at 1034–35 (citing *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007); *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002); *Hervey v. Estes*, 65 F.3d 784, 788 (9th Cir. 1995)).

More recently, in *Hardwick*, we denied qualified immunity to social workers who deliberately submitted false testimony to a court during a custody proceeding that ultimately resulted in the removal of the minor plaintiff from her mother's custody. 844 F.3d. at 1114–15. There, the defendants argued that the right to be free from judicial deception had not yet been clearly established in *civil* child dependency proceedings, only in *criminal* proceedings against parents. *Id.* at 1117. We squarely rejected that

argument, explaining that regardless of whether the proceeding occurred in the criminal or civil context, a reasonable official would have fair notice that "the knowing use of false evidence [is] absolutely and obviously irreconcilable with the Fourteenth Amendment's guarantee of Due Process in our court." *Id.* at 1119. In light of these decisions, the right to be free from judicial deception in matters of child custody "is beyond debate." *Id.* at 1117.**³**

To state a violation of the constitutional right to familial association through judicial deception, a plaintiff must allege "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Benavidez*, 993 F.3d at 1147; *see Greene*, 588 F.3d at 1035. A misrepresentation or omission is "material" if a court "would have declined to issue the order had [the defendant] been truthful." *Greene*, 588 F.3d at 1035.

Here, David alleges that the Petition that Kaulukukui prepared omitted any reference to the Custody Order or its terms and that neither Keahiolalo nor Kaulukukui otherwise informed the family court of the Custody Order. David also alleges that Kaulukukui "acted in concert" with other Defendants to (1) "file and serve the [P]etition in the family court," (2) "provide Defendant Keahiolalo with advice enabling him to obtain the protective order," and in doing so, (3) "circumvent the existing [Custody Order]." She states that beginning on December 2, 2019—the day the Petition

---

**³** Although *Greene* and *Hardwick* concerned affirmative false statements rather than omissions (as is alleged here), we have consistently held that judicial deception may occur through deliberate omission or affirmative misrepresentation. *See Greene*, 588 F.3d at 1035; *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004).

was filed—Kaulukukui (and the other defendants) "worked together at every step with Defendant Keahiolalo *to assist with and prepare documents that deliberately misled the Family Court*." (emphasis added).

In order to "circumvent" the Custody Order and "deliberately misle[ad] the Family Court," Kaulukukui necessarily must have known of the Custody Order and intentionally decided not to discuss it in the Petition or bring it to the family court's attention.[4] Accordingly, based on these allegations, we conclude that the FAC plausibly alleges that Kaulukukui deliberately made a "misrepresentation or omission" to a court of law.[5] *Benavidez*, 993 F.3d at 1147.

---

[4] Notably, in her opening brief, Kaulukukui acknowledged that "the [C]omplaint essentially alleges that . . . [she] conspired at every step to circumvent the terms of the [Custody Order] . . . *by intentionally omitting reference in the TRO application to the [Custody Order]*, in order to deliberately mislead the family court into issuing a TRO, and using the TRO to pry B.D. from Ms. David's custody." Op. Br. at 14–15 (emphasis added). Although she pointed out in a footnote that the district court held that the FAC plausibly alleged that she knew about the Custody Order prior to filing the Petition, or shortly thereafter, she did not challenge the district court's conclusion on this point until her reply brief. Therefore, in addition to being unpersuasive for the reasons stated above, this argument is likely waived. *See Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are waived." (internal quotation marks and citation omitted)).

[5] Our caselaw also clearly establishes that judicial deception may occur when an omission or misrepresentation of material information is made "recklessly." *Greene*, 588 F.3d at 1035. However, because the FAC alleges that Kaulukukui's omission of the Custody Order from the Petition was deliberate, we need not address whether it was reckless.

Additionally, David alleges that "had the presiding judge in the Family Court been informed of the [Custody Order], Defendant Keahiolalo's application for a temporary restraining order would not have been granted as to B.D." In other words, she claims that but-for Kaulukukui's misrepresentation or omission, David would not have been deprived of custody over B.D., meaning that the omission was material. *See Greene*, 588 F.3d at 1035. Thus, we conclude that David has successfully stated a claim for violation of her and B.D.'s right to familial association based on judicial deception.

In arguing otherwise, Kaulukukui contends that the altercation between David and Keahiolalo made it reasonable for her to believe that she could assist Keahiolalo in filing the Petition on B.D.'s behalf given the plain language of the Hawaii Domestic Violence Protective Orders statute and the "Compelling Emergency" provision of the Custody Order. Moreover, she asserts that no statute or caselaw affirmatively required her to address the Custody Order in the Petition. Thus, she argues that it was not clear to a reasonable official in her position that assisting a non-custodial parent in obtaining a protective order without informing the family court of the Custody Order was unlawful.

Kaulukukui's arguments fail for two reasons. First, regardless of Hawaii's generally applicable Protective Orders statute, the Custody Order that defined David's and Keahiolalo's parental rights deprived Keahiolalo of the ability to seek judicial relief related to B.D. absent a "compelling emergency that affects [her] health or safety." There is no indication that Kaulukukui was led to believe there were any circumstances presenting an emergent risk to B.D. Additionally, as the district court noted, Kaulukukui's

reliance on the Compelling Emergency provision necessarily admits that she knew when she filed the Petition that (1) David had sole custody of B.D., (2) Keahiolalo lacked any custody or visitation rights, and (3) Keahiolalo was generally prohibited from seeking relief on B.D.'s behalf. Nevertheless, Kaulukukui deliberately chose not to inform the family court of the Custody Order's terms.

Second, regardless of whether there is specific authority *requiring* that a custody order be included in a petition for a protective order, the FAC alleges more than just that Kaulukukui prepared and filed the Petition on Keahiolalo's behalf; it alleges that Kaulukukui knowingly and deliberately omitted material custody information from the Petition to mislead the family court into issuing the TRO that allowed Defendants to deprive David of custody. While Kaulukukui's arguments focus on whether a reasonable official *could* believe that the terms of a custody order are not affirmatively required to be included in a petition for a protective order, they do not address whether an official may reasonably believe she can deliberately conceal material custody information from a court for the purpose of depriving a custodial parent of her child.

We conclude that any reasonable official would understand that the latter behavior—if proven—violates the law. As such, it is "hardly conduct for which qualified immunity is either justified or appropriate." *See Hardwick*, 844 F.3d at 1119.

## B.  Removal of B.D.

David also alleges that Kaulukukui's participation in removing B.D. and placing her in Keahiolalo's custody was a constitutional violation. Again, our caselaw clearly establishes that the right to familial association is violated "if

a state official removes children from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury." *Keates*, 883 F.3d at 1237–38. Additionally, even if there is reasonable cause to believe that the initial removal of a child without a court order or consent is necessary, the continued separation of a child from her custodial parent is constitutional only if "the scope, degree, and duration of the intrusion" is "reasonably necessary to avert the specific injury at issue." *Id.*; *see Wallis*, 202 F.3d at 1138.

For example, in *Wallis*, police officers seized the plaintiffs' children without a court order after the mother's institutionalized, mentally ill sister reported to her therapist that the children's father was going to sacrifice his son to Satan on the Fall Equinox and cover it up with a car accident. 202 F.3d at 1131. After the therapist reported this threat to Child Protective Services, police entered the family's home around midnight, took the children into custody without a court order, and transported them to a hospital where they were subjected to internal body cavity examinations without the plaintiffs' presence or consent. *Id.* at 1134–35. The children were not returned to the plaintiffs' custody for two and a half months. *Id.* at 1034. There, we concluded that because the officers failed to investigate the institutionalized sister's "bizarre tale," interview the children's mother, or otherwise conduct a sufficient background investigation, "a reasonable jury could find that the officers did not have reasonable cause to remove the children without a court order." *Id.* at 1040.

Additionally, we held that even if the children's initial removal was reasonable, there was a genuine dispute as to

whether "the actions taken by the officers—removing the children from their *mother* and placing them in an institution—exceeded the permissible scope of the action necessary to protect them from that immediate threat." *Id.* at 1138. Because the alleged danger to the plaintiffs' son "was to occur specifically and only on [the Fall Equinox]," there was a genuine dispute "as to whether the emergency continued to exist for more than the brief day or two." *Id.* at 1140. In addition, because "the police had no information whatsoever that implicated the children's mother in any past or future abuse," there was a genuine dispute whether placing the children "in a county institution for an indefinite period, was sufficiently strictly circumscribed by the exigency that justified the [defendants'] intrusion into the children's lives." *Id.* at 1140–41 (internal quotation marks and citation omitted).

Turning to this case, David sufficiently alleges that Kaulukukui participated in removing B.D. from her custody without a court order, placed B.D. in Keahiolalo's custody, and prevented David from having contact with B.D. or regaining custody. These allegations, if true, violate a clearly established constitutional right to familial association. Based on the allegations in the FAC, there was *no* reason, much less "reasonable cause," to believe that B.D. was in any "imminent danger of serious bodily injury." *Id.* at 1138. In fact, the FAC indicates quite the contrary—shortly before the surreptitious "grab-and-go" operation, a CWS official visited David's home, performed a Comprehensive Strengths and Risk Assessment Rating, and rated David a 3 on a risk scale of 0–51, meaning that there was a low/moderately low risk of harm in David's home. Additionally, the FAC alleges that CWS officials surveilled David for several days before deciding to take custody of

B.D., demonstrating that there was sufficient time to obtain a court order.

Not only did Kaulukukui and the other Defendants remove B.D. and place her with someone they knew had no custodial rights without legal justification, David also alleges that they conspired to prevent her from filing a police report or otherwise having her claims regarding Keahiolalo's unlawful custody investigated. These allegations state a plausible claim for a violation of a clearly established constitutional right to familial association.

Moreover, even if B.D.'s initial removal was supported by reasonable cause, David alleges facts plausibly indicating that the Defendants, including Kaulukukui, "exceeded the scope of any intrusion necessary to protect [B.D.]." *Keates*, 883 F.3d at 1239. The FAC states that David was not able to speak with or see B.D. for 21 days. Nor was she informed of B.D.'s whereabouts. With no indication that B.D. faced any past abuse by David or that B.D. was at risk of future abuse, "there was no basis for preventing [David] from having contact with [B.D.]" or for separating B.D. from David for 21 days. *Id.* Again, the FAC alleges that CWS itself had deemed David's home to be at the lowest risk level just days before B.D. was removed from her mother's care. Based on these allegations, the 21-day separation was significantly longer than "reasonably necessary to alleviate [a] threat of immediate harm." *Wallis*, 202 F.3d at 1140 (citation omitted).

\* \* \* \* \*

When the alleged events in this case occurred, the law clearly established that a parent and child's constitutional right to familial association is violated when a state official interferes with a parent's lawful custody through judicial

deception. The law also clearly established that a state official cannot remove a child from a lawful custodial parent without consent or a court order unless the official has reasonable cause to believe that the child is in imminent danger and, even then, the scope and duration of the removal must be reasonable. Here, David has plausibly alleged that Kaulukukui violated these rights by deliberately failing to inform the family court of the Custody Order when assisting Keahiolalo in obtaining a TRO that prevented contact between David and B.D. and by assisting the other Defendants in removing B.D. from David's custody and separating them for 21 days.

Kaulukukui may ultimately prove that David's allegations are false. But at the pleading stage, we must accept all well-pleaded factual allegations as true. *Hernandez*, 897 F.3d at 1132; *see also Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004) ("[W]hile government officials have the right . . . to raise and immediately appeal the qualified immunity defense on a motion to dismiss, the exercise of that authority is not a wise choice in every case."). As such, we conclude that Kaulukukui is not entitled qualified immunity at this early stage and affirm the district court's denial of her motion to dismiss.

**AFFIRMED.**