**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RACHEL SCANLON; STEVEN SAWYER, individually and as Guardian Ad Litem for K.X. and G.X.; K. X., a minor; G. X., a minor, | No. 21-55999 |
| | D.C. No. 2:18-cv-07759-CBM-AS |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| COUNTY OF LOS ANGELES; LOURDES OLARTE; MARISOL GONZALEZ; ANGELA HASHIZUME, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted June 15, 2023
Pasadena, California

Filed February 2, 2024

Before:  Jay S. Bybee and Morgan Christen, Circuit Judges,
and Eric N. Vitaliano,[*] District Judge.

Opinion by Judge Bybee

## SUMMARY[**]

### Social Worker Immunity

The panel affirmed in part and reversed in part the district court's judgment in favor of the Department of Child and Family Services of the County of Los Angeles and individual social workers in a 42 U.S.C. § 1983 action arising when social workers removed minor children K.X. and G.X. from their parents' custody following an anonymous report that the parents were using medical marijuana therapy to treat K.X.'s severe autism.

The panel reversed the district court's summary judgment for defendants on the parents' judicial deception claims. The panel concluded that defendants' application filed in support of the warrant of removal contained misrepresentations and omissions of fact and that a reasonable trier of fact could find the misrepresentations material. Defendants were not entitled to qualified

---

[*] The Honorable Eric N. Vitaliano, United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

immunity because the right to be free from judicial deception was clearly established.

The panel affirmed the district court's judgment on the pleadings for defendants on the parents' Fourth Amendment claim concerning social worker Lourdes Olarte's interview of G.X. at her school. Lourdes was entitled to qualified immunity because she lacked fair notice that her conduct was unlawful.

The panel reversed the district court summary judgment for defendants on the parents' claim for intentional infliction of emotional distress, which the district court dismissed for the same reason as the judicial deception claim. Because the panel reversed the district court's holding on judicial deception claim, it also reversed the district court's holding on the emotional distress claim.

The panel reversed the district court's summary judgment for defendants on the parents' *Monell* claim because there was evidence in the record from which a jury could find that defendants maintain a practice of omitting exculpatory information from petitions for removal in a manner tantamount to an official "policy of inaction."

Finally, the panel held that the district court did not abuse its discretion by re-reading its jury instructions, rather than providing additional instructions, in response to a jury question.

**COUNSEL**

Joseph S. Klapach (argued), Klapach & Klapach PC, Sherman Oaks, California, for Plaintiffs-Appellants.

Avi Burkwitz (argued) and Gil Burkwitz, Peterson Bradford Burkwitz LLP, California, for Defendants-Appellees.

---

**OPINION**

BYBEE, Circuit Judge:

Plaintiffs Rachel Scanlon and Steven Sawyer (together, the "Parents") have two young children, one of whom has severe autism. After consultation with medical professionals, the Parents received a recommendation for their autistic daughter to begin medical marijuana therapy. Following an anonymous report, social workers from the Department of Child and Family Services of the County of Los Angeles ("DCFS" or the "Department") investigated the report, obtained a judicial order authorizing them to remove both children, and placed them in foster care. Alleging numerous deficiencies in DCFS's investigative and removal processes, the Parents, on their own and as guardians *ad litem* for their minor children, brought suit against DCFS and individual social workers under 42 U.S.C. § 1983.

The district court granted summary judgment for the defendants on the majority of the Parents' claims. *Scanlon v. County of Los Angeles*, No. 18-CV-7759, 2021 WL 2420164 (C.D. Cal. May 21, 2021); *Scanlon v. County of Los Angeles*, 495 F. Supp. 3d 894 (C.D. Cal. 2020). The remaining claims went to trial, where a jury returned a verdict for the defendants. The Parents have appealed the

district court's summary judgment rulings and bring one claim of trial error.  We affirm in part and reverse in part.

## I.  FACTS AND PROCEEDINGS

### A.  *Facts*

The facts of this case are lengthy and sharply contested. The Parents have two minor children who, in the interest of anonymity, were referred to throughout the proceedings below as K.X. and G.X.   At the time of the events in question, K.X. was nine years old; G.X. was five.[1]  K.X. was diagnosed with autism when she was two-and-a-half years old.   Because of her special needs, K.X. has received behavioral treatment at home, school, and in outpatient centers.

Around age five, K.X. began showing signs of aggression, such as hitting, scratching, biting, and kicking others.  By age seven, these behaviors had turned on herself: K.X. would often bang her head against the wall and bite herself.  These episodes grew worse and more frequent with time.   By 2017, when K.X. was nine, she would suffer multiple bouts of aggression and self-harm every hour. Because of her violent behavior, K.X. struggled to participate in class, her private school canceled her after-school activities, and she was eventually asked to leave.

The Parents engaged professionals to help K.X. cope with her behavioral issues.  Scanlon initially met with K.X.'s pediatrician, Dr. Elaine Gutierrez.  Upon learning of K.X.'s aggression, Dr. Gutierrez prescribed Vayarin, a medication used to treat Attention-Deficit/Hyperactivity Disorder

---

[1] To the extent that this opinion reveals sealed information, the court unseals that information for purposes of this disposition only.

("ADHD"). Dr. Gutierrez also referred K.X. to a psychiatrist, but K.X. was unable to take the psychiatrist's written, spoken, and typed tests, and the referral proved ineffective. Scanlon asked Dr. Gutierrez about trying other ADHD medications, but Dr. Gutierrez advised against them.

In the course of her conversations with Dr. Gutierrez, Scanlon inquired about medical marijuana as a possible treatment for K.X. Dr. Gutierrez replied that she did not have any experience with this approach. In February or March 2017, Scanlon attempted to schedule an appointment with Dr. Bonni Goldstein, a leading expert on pediatric medical marijuana who had treated more than a thousand autistic and epileptic children. At that time, Dr. Goldstein had a year-long waiting list, which meant she would not be able to offer any immediate solutions to K.X.'s behavioral problems.

In the meantime, Scanlon got in touch with CannaKids, an organization that provides guidance on medical cannabis for patients of all ages, to learn more about possible marijuana treatments. CannaKids referred Scanlon to Dr. Peter Mendelsohn, a board-certified anesthesiologist and pain management specialist in Los Angeles, who had some experience treating autistic children with medical marijuana.

On July 28, 2017, Scanlon consulted Dr. Mendelsohn. He gave K.X. a physical evaluation and concluded that she was a good candidate for treatment. Dr. Mendelsohn gave a recommendation for K.X. to begin using medical marijuana, which was valid for one month and required a follow-up visit to obtain any additional recommendations. Dr. Mendelsohn advised patients like K.X. to start marijuana treatment at the lowest possible dose and to watch for side effects. He

observed that CannaKids shared this philosophy. He did not recommend or prescribe any particular dosage.

After obtaining Dr. Mendelsohn's recommendation, Scanlon ordered THC[2] oil from CannaKids. For dosing, she worked with Janie Maedler, a dosing specialist at CannaKids. Maedler, who lived outside California and was not a licensed medical provider, was the mother of an autistic child and had advised other parents with autistic children. Maedler recommended giving K.X. 0.2 milliliters of THC oil for a week and then noting her response. According to Scanlon, the difference in K.X.'s behavior "was like night and day." Her tantrums and aggression decreased, and she was more compliant and better behaved in school. After a week, Maedler suggested that Scanlon slightly increase the dosage to see if the improvements in K.X.'s behavior would continue. Scanlon did so and thought that K.X.'s progress was "even better."

On August 28, 2017, K.X. had a follow-up phone call with Dr. Mendelsohn. He recommended that she continue the regimen and issued a second recommendation for medical marijuana, which was valid until the following July.

K.X.'s new treatment did not go unnoticed at school. Alida Turner, K.X.'s teacher, knew from conversations with Scanlon that K.X. was on a new medication, although she did not initially know she was taking medical marijuana. Turner thought K.X. was better behaved and "more

---

[2] "THC" stands for tetrahydrocannabinol, a compound contained in cannabis. It is distinguished from cannabidiol ("CBD"), another cannabis compound, which does not generally produce the psychoactive effects of THC. *See* Substance Abuse & Mental Health Servs. Admin., Pub. No. PEP22-06-04-003, SAMHSA Advisory: Cannabidiol (CBD)—Potential Harms, Side Effects, and Unknowns 1 (2023).

talkative, compliant, . . . . [and] calm." During this period, Turner texted with Scanlon and told her, "[I]t's working. I can see. I can work with her better." She reported to Scanlon that the new medicine was "doing good" and that when K.X. was not taking the medicine, she was "more aggressive." At some point, Turner learned that K.X.'s new medication was marijuana-based.

In September, the DCFS child welfare hotline received two separate anonymous referrals. These reported that K.X. had arrived at school lethargic, with glazed eyes, and apparently under the influence of marijuana. On September 15, social worker Lourdes Olarte was assigned to investigate the referrals. That same day, Olarte went to K.X.'s school and spoke with Turner. Many details of this visit are disputed. Olarte reported that Turner told her that "school staff"—never identified—had smelled marijuana on K.X., although Turner herself had not. Olarte further claimed Turner told her that K.X. "appeared to be under the influence, . . . . giggly one moment and overly calm the next"; that K.X.'s eyes were "droopy," and she showed "delayed response"; that K.X. was more "mellow" and "s[at] out during recess"; and that K.X. was "so affected by [her] medication" that she had trouble keeping her balance and was "unable to write her name or keep her pencil straight." Turner contradicted these observations in her deposition. She claimed that she never observed K.X. behaving in an intoxicated manner and that, if she had, she would have called someone to report it. Turner also testified that, although she told Olarte that K.X. was "mellow" and "giggly one moment and overly calm the next," she never claimed that K.X. was "under the influence," stumbling, that her eyes were "droopy," or that she was unable to write her name or keep her pencil straight.

Later that same day, Olarte spoke to Scanlon at home. The parties also disagree about what happened during this encounter. Scanlon claims that Olarte told her there had been a report of K.X. "having some difficulty with [her] balance and . . . [that] someone had smelled something on her breath." Olarte asked directly about K.X.'s medications, so Scanlon assumed that Olarte had learned of K.X.'s medical marijuana treatment from her school. She recalls showing Olarte the THC bottle and letting her handle it and read the label. Scanlon says that she told Olarte that K.X. was receiving medical marijuana therapy under the supervision of Dr. Mendelsohn, a trained physician; that she offered to send her a copy of Dr. Mendelsohn's recommendation via email; and that she told Olarte about CannaKids and said Olarte could contact Maedler through the organization's website. Scanlon also asserts that when Olarte expressed concerns about THC storage and safety, the Parents purchased a lockbox that same day or the very next. Three days after Olarte's initial house visit, Scanlon sent her a message in which she provided the email address of the CEO of CannaKids and indicated that someone there would be willing to speak with her.

Olarte paints a very different picture of her meeting with Scanlon. She contends that Scanlon was uncooperative and refused to divulge information about the doctor supervising K.X.'s treatment, the dosage of the THC oil, or K.X.'s sister, G.X., whose details were pertinent "to verify that all the people on the referral [we]re accounted for." Olarte also claims that Scanlon would not let her handle the THC bottle and instead simply "flashed it . . . and put it away." Despite their different recollections of this September 15 meeting, the parties agree that Scanlon did not provide specific dosage information at that time and that Olarte told Scanlon that the

household needed a lockbox to store the THC.  They also agree that Scanlon sent Olarte Dr. Mendelsohn's written recommendation for K.X.'s treatment as well as contact information for K.X.'s pediatrician, Dr. Gutierrez.

From Scanlon's home, Olarte went directly to G.X.'s school.  Olarte pulled G.X. out of class and met with her alone in an administrative office.  She reported that G.X. looked "healthy and well cared for."  Nevertheless, Olarte asked her several questions about K.X.'s medicine, including if she had access to it.  G.X. replied that the medicine was on a "high shelf," that only her sister took the medicine, and that she was not allowed to touch it.  Still, "[s]he giggled" and admitted having handled the THC bottle while climbing on the counter to get snacks.

Three days later, on September 18, Olarte reached out to Dr. Gutierrez.  Dr. Gutierrez was unaware that K.X. was taking medical marijuana but, while unfamiliar with its use for autism, had "heard . . . [of] children with epilepsy . . . being treated with cannabis oil."  Olarte tried contacting Dr. Mendelsohn and CannaKids but was unsuccessful.  Ultimately, she referred the case to her supervisor, Marisol Gonzalez.

At DCFS's request, the Parents met with Olarte and another social worker, Marisha Harris, at the DCFS office on September 19.  As with their prior encounters, the parties similarly disagree about what happened at this meeting.  Sawyer claims that Harris opened the meeting by telling them they were "great parents" but that DCFS would have to remove their kids.  According to the Parents, Harris and Olarte urged them to sign a bevy of documents, including a medical consent form.  When the Parents refused to do so without their attorney—who was not present per DCFS

policy—the social workers took back the papers without giving the Parents a chance to read them.  At that point, the Parents say, Harris told Olarte that DCFS "should just go for removal" of the two girls, and Olarte agreed.  According to Scanlon, DCFS was intent on removing the children despite her informing the social workers that she had satisfied Olarte's instruction by buying a lockbox and although the social workers never asked the Parents to discontinue medical marijuana during the meeting.  Following this baffling encounter, Sawyer asked for a supervisor, and Gonzalez joined the meeting.

The defendants' memory of their meeting with the Parents begins with the social workers asking for additional information about K.X.'s treatment and the degree to which a pediatrician was involved.  They claim that DCFS expressed a desire "to work with the[] [Parents] in assuring [K.X.] [wa]s getting the proper treatment" but that Sawyer rejected this suggestion as an attempt to force them into doing what DCFS "tell[s] [them] to do."  Once the social workers "explained . . . the court process," Sawyer evidently lost his temper and yelled that DCFS was scheming to remove the children.  Fearing that further discussion would get them nowhere, the social workers informed the Parents that, because they were not forthcoming about K.X.'s treatment, DCFS had no choice but to take the girls.  On September 26, 2017, Olarte prepared a Statement of Cause to apply for a "protective custody warrant" to detain both children.  Despite Olarte's own observations that the children appeared to be healthy, the warrant application alleges "probable cause to believe" that K.X. and G.X. are "person[s] described by Welfare and Institutions Code § 300," that "[t]he child(ren)'s physical environment poses a threat to the[ir] health or safety," and that "there are no

reasonable means by which the[y] . . . can be protected
without temporary removal from the physical custody of the
parents."**3**

In support of its claim of "general neglect" by the
Parents, the Statement rests entirely on "evidence[] . . . that
mother and father are treating child, minor [K.X.]'s autism
with cannabis oil and have not consulted with a medical
professional or a professional who deals with autism." The
evidence of neglect includes purported observations by
K.X.'s teacher that "[K.X] appeared to be under the
influence" and that "school staff . . . smelled the scent of
marijuana on [her]." The Statement claims that Scanlon was
"'experimenting' with the dosage" of marijuana she gave to
her daughter, leading K.X.'s teacher to find her "unable to

---

3 California Welfare and Institutions Code § 300 sets forth the
circumstances under which "[a] child . . . comes within . . . the
jurisdiction of the juvenile court [and] may [be] adjudge[d] . . . to be a
dependent child of the court." *Id.* The grounds for filing a petition with
the juvenile court include that "[t]he child has suffered, or there is a
substantial risk that the child will suffer," either "serious physical harm
inflicted nonaccidentally . . . by the child's parent or guardian," *id.*
§ 300(a), or "serious physical harm or illness, as a result of . . . [t]he
failure or inability of the child's parent or guardian to adequately
supervise or protect the child," *id.* § 300(b)(1).

Section 340 provides the grounds for a court to issue a "protective
custody warrant . . . without filing a petition under Section 300." To do
so, the court must find "probable cause to support all of the following":

> (1) The child is a person described in Section 300.
> (2) There is a substantial danger to the safety or to the
> physical or emotional health of the child.
> (3)   There are no reasonable means to protect the
> child's safety or physical health without removal.

*Id.* § 340(b); *see also id.* § 306(a)(2) (providing the grounds for taking a
child into protective custody without a warrant).

write her name or keep her pencil straight." It further references Scanlon's "limited cooperation" with DCFS and asserts that she had failed to be forthcoming about K.X.'s treatment. Although the Statement concludes by noting that the Parents "have not consulted with a medical professional or a professional who deals with autism," it earlier refers to their consultations with pain specialist Dr. Mendelsohn and K.X.'s regular pediatrician, Dr. Gutierrez, as well as the Parents' pending appointment with a pediatrician specializing in treating autism with cannabis, Dr. Goldstein. Olarte vouched for the above under penalty of perjury.

On September 27, 2017, a warrant directing the removal of K.X. and G.X. was approved by the Superior Court. The following day, DCFS personnel picked up K.X. and G.X. and sent them to separate foster homes—neither of which "w[as] experienced in dealing with children with autism"— where they spent the next five days. After the children's removal, Olarte tried to reach Dr. Goldstein but was unsuccessful.

The Dependency Court held a hearing on the girls' case on October 3, 2017. Dr. Goldstein attended the hearing and agreed to be involved in K.X.'s treatment going forward. That same day, the Dependency Court released K.X. and G.X. back to their Parents. On December 7, 2017, the Dependency Court dismissed DCFS's petition with prejudice, in the "Interest of Justice."

B.  *Proceedings Below*

In September 2018, the Parents (for themselves and on behalf of their minor children) sued DCFS, Olarte, Gonzalez, Harris, a third social worker (Angela Hashizume), and ten Doe defendants under 42 U.S.C. § 1983. Defendants filed a motion to dismiss, which the district court granted

with leave to amend.  The Parents then filed their first amended complaint, alleging six causes of action:  (1) First, Fourth, and Fourteenth Amendment violations in connection with Olarte's September 15 interview of G.X. at school; (2) Fourth and Fourteenth Amendment violations for procuring the children's removal by a fraudulent or misleading warrant; (3) a violation of the Fourteenth Amendment right to be free from judicial deception; (4) Fourth and Fourteenth Amendment violations for medical examinations of the children; (5) a *Monell* claim[4] against DCFS; and (6) a claim for intentional infliction of emotional distress ("IIED") against the individual social workers.

Defendants answered the Parents' amended complaint and moved for judgment on the pleadings as to the first, fourth, and fifth claims identified above.  In October 2020, the district court granted defendants' motion as to the first and fourth[5] claims and denied it as to the fifth claim, except insofar as the *Monell* claim stemmed from Olarte's schoolhouse interview of G.X. (the basis for the first claim). *Scanlon*, 495 F. Supp. 3d at 904.  Relying on *Capp v. County of San Diego*, 940 F.3d 1046 (9th Cir. 2019), the court concluded that a social worker's interview of a child without parental consent was not a clearly established constitutional violation and so the defendants were entitled to qualified immunity.  *Scanlon*, 495 F. Supp. 3d at 898–99.

---

[4] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 662–63 (1978) (holding that "local government[s] . . . are 'persons'" for purposes of 42 U.S.C. § 1983).

[5] The Parents "neither oppose[d] nor address[ed]" defendants' motion as to the fourth claim (concerning medical examinations of the children); hence, the court granted the motion as to that claim.

Defendants moved for summary judgment, this time on plaintiffs' remaining claims. *Scanlon*, 2021 WL 2420164. In May 2021, the district court granted summary judgment for defendants as to the fraudulent warrant, judicial deception, and IIED claims (plaintiffs' second, third, and sixth claims, respectively), to the extent those claims were directed to the removal of K.X., and granted summary judgment for defendants as to the entirety of the *Monell* claim (plaintiffs' fifth claim). The court concluded that the alleged misrepresentations included in the removal warrant—namely those pertaining to the degree of medical involvement in K.X.'s treatment and her reported intoxication—"[we]re not material to [the Superior Court's] finding that there was probable cause to remove the minors from [P]arents' custody." It also found no triable issue as to the *Monell* claim, since DCFS maintained a general policy of "honesty and integrity in report[ing]" and review with respect to warrants. As for the IIED claim, the court held that this failed for the same reason as the judicial deception claim—specifically, defendants' satisfactory showing that "the warrant package did not contain material misrepresentations." The court, however, denied summary judgment as to the portions of plaintiffs' second, third, and sixth claims concerning G.X., finding a triable issue of fact regarding whether the Parents had communicated their purchase of a lockbox to DCFS and whether the absence of a lockbox was material to G.X.'s detention.

The court proceeded with trial on the remaining claims. Based on the nature of these claims, the key issue at trial was the Parents' purchase of a lockbox. The Parents each testified that they bought a lockbox after their initial September 15 meeting with Olarte. They likewise insisted that they told Olarte about their purchase at the subsequent

September 19 meeting and that she indicated the lockbox was no longer an issue at that time. However, beyond their own sworn testimony, the Parents did not produce any evidence to prove that they ever bought a lockbox. Contrary to the Parents' contentions, Olarte denied ever being informed about the lockbox, as did Harris and Gonzalez.

At closing argument, counsel for the defendants asserted that the Parents had failed, more likely than not, to communicate their purchase of a lockbox to DCFS, since the record disclosed no email, text, receipt, or proof of purchase. During deliberations, this line of argument prompted a juror to pose the following question to the judge:

> How come the receipt of the box is not brought up during the trial and why it's only now in the rebuttal? If it is not, why deal with the receipt where, in fact, that dad said he has purchased the box during the meeting September 19, 2017? Verbal is enough as long as it is documented. Correct me if I am wrong.

After receiving this note ("Juror Note No. 4"), the court met with counsel outside the presence of the jury and proposed to respond by re-reading instructions 1, 3, 5, 8, and 24. These focused on the jury's mandate to decide the case "solely on the evidence before [it]." Counsel for the Parents agreed with this approach, while counsel for the defendants suggested adding an additional instruction to clarify that closing arguments may highlight the absence of evidence from the record. This proposal elicited an objection from the Parents' counsel, who feared the instruction would imply that the Parents had an affirmative duty to produce

documentary evidence.  The court called back the jury and had the juror who submitted the question read it aloud.  In response, the court indicated that it could not say "why [the receipt issue] did not come up earlier."  It then re-read the instructions, as previously proposed to counsel.

Outside the presence of the jury, defendants' counsel asked to submit additional briefing on the propriety of an instruction about the absence of documentary evidence.  The Parents' counsel objected to this request and voiced renewed concern over the juror's question as to the sufficiency of oral evidence standing alone.  The Parents' counsel observed that the ultimate issue—whether testimony about the purchase of a lockbox was enough without a physical receipt—had not been addressed by the court.  The court's instruction to decide the case solely on the evidence may thus have caused additional confusion.  The court replied that, in its view, the problem was that none of the parties had directed evidence—testimonial *or* documentary—to the question of a *receipt* for purchase of the lockbox.  The Parents' counsel asked the court to instruct the jury that it could credit testimony that the Parents had bought a lockbox, even without specific testimony concerning a receipt.  The court refused to give this instruction.  The jury returned a unanimous verdict in favor of the defendants, and the court entered final judgment on September 8, 2021.

The Parents now appeal the district court's judgment on the pleadings as to their Fourth Amendment claim concerning Olarte's interview of G.X.; its grant of summary judgment on their judicial deception, *Monell*, and IIED claims; and its refusal to provide an additional instruction in response to the juror's question.

## II.  JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We review an order granting judgment on the pleadings de novo.  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).  Judgment on the pleadings is proper "when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law."  *Id.*  In our review, we must "accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party."  *Id.* (citing *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004)).

We similarly review a district court's order granting summary judgment de novo.  Our review must "determine if, viewing the evidence and drawing all inferences in the light most favorable to the non-moving party, 'any genuine issues of material fact remain and whether the district court correctly applied the relevant substantive law.'"  *Nieves Martinez v. United States*, 997 F.3d 867, 875 (9th Cir. 2021) (quoting *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011)).  Where summary judgment was granted on the basis of qualified immunity, "[o]ur jurisdiction is limited to questions of law, and does not extend to qualified immunity claims involving disputed issues of material fact. Where disputed facts exist, we assume that the version of the material facts asserted by . . . the non-moving party[] is correct."  *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1107 (9th Cir. 2010) (quoting *KRL v. Est. of Moore*, 512 F.3d 1184, 1188–89 (9th Cir. 2008)).

A district court's response to a juror's question, when countered by a timely objection, is reviewed for abuse of discretion.  *Arizona v. Johnson*, 351 F.3d 988, 993 (9th Cir.

2003). If counsel fails to object, we review for plain error. *Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017).

## III. DISCUSSION

The Parents have raised five issues on appeal: first, whether the district court erred in granting summary judgment on their claim that the individual defendants filed a materially misleading Statement of Cause in connection with the application to remove K.X. and G.X., in violation of the Fourth and Fourteenth Amendments; second, whether the district court erred in granting judgment on the pleadings as to their Fourth and Fourteenth Amendment claims regarding Olarte's interview of G.X.; third, whether the district court erred in granting summary judgment on their IIED claim; fourth, whether the district court erred in granting summary judgment for DCFS on their *Monell* claim; and fifth, whether the district court erred when it reread its jury instructions in response to a juror question. We affirm the judgment with respect to the second and fifth issues. We reverse as to the first, third, and fourth issues.

A. *The District Court Erred in Granting Summary Judgment for Defendants on Plaintiffs' Judicial Deception Claim*

The Parents argue that DCFS social workers violated their right to familial association under the Due Process Clause of the Fourteenth Amendment, as well as the Fourth Amendment rights of K.X. and G.X., by providing false or misleading information to the dependency court that authorized the children's removal. The district court reviewed "[t]he alleged misrepresentations, omissions, and false statements" in the Statement of Cause submitted with the application and concluded that they "[we]re not material

to finding that there was probable cause to remove the minors from [P]arents' custody." *Scanlon*, 2021 WL 2420164, at *5. We disagree.

### 1. Constitutional and Statutory Standards for Removing Children from Their Parents

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Among "the oldest of the fundamental liberty interests recognized by [the Supreme] Court" is "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion). Although the Supreme Court has largely grounded this right in the Due Process Clause, we have also found it to be protected by the First and Fourth Amendments, made applicable to the states by the Fourteenth Amendment. *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (observing that "[the] right [to familial association] is entirely judge-made" and that the "courts [have not] been entirely clear regarding [its] source," relying "variously . . . on the Fourteenth, First, and Fourth Amendments"). This right has both substantive and procedural components, thus placing a high burden of proof on the state and guaranteeing parents "fundamentally fair procedures" before the "state interven[es] into ongoing family affairs." *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982). K.X. and G.X. likewise have a Fourth Amendment right to be free from "unreasonable . . . seizures," U.S. Const. amend. IV, which was implicated when they were taken into state custody. Despite the differing constitutional sources of the right to familial association, we have held that "the same legal standard applies in evaluating [both] Fourth and Fourteenth Amendment claims for the removal of the

children." *Keates*, 883 F.3d at 1236 (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000)).  We have

> woven these constitutional threads into a discrete constitutional right in cases where state officials remove children from parents without consent or due process. . . . [T]he rights of parents and children to familial association under the Fourteenth, First, and Fourth Amendments are violated if a state official removes children from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue.

*Id.* at 1236–38.

Our cases have addressed the constitutional standards for seizing a child without a warrant. *See*, *e.g.*, *id.* at 1235–38; *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 790–91 (9th Cir. 2016) (en banc); *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294–96 (9th Cir. 2007); *Mabe v. San Bernardino County*, 237 F.3d 1101, 1106–09 (9th Cir. 2001); *Wallis*, 202 F.3d at 1140–41.  K.X. and G.X., however, were seized pursuant to a warrant. *See* Cal. Welf. & Inst. Code § 340(a) (setting out the standards for issuing a protective custody warrant); *In re Jerry R.*, 313 Cal. Rptr. 3d 422, 443 (Ct. App. 2023) ("[Section 340(a)] authorizes the issuance of a warrant where the danger is substantial but falls

short of the exigency justifying warrantless removal."); *In re Robert F.*, 307 Cal. Rptr. 3d 228, 232 (Ct. App. 2023) ("[S]ection 340 requires neither imminent danger nor the threat of physical harm for the court to issue a warrant."). After the children were seized, DCFS filed a dependency petition, which resulted in a judicial hearing and the return of the children. *See* Cal. Welf. & Inst. Code § 300(b)(1) (setting out the standards for declaring a child a dependent of the juvenile court).

We have never examined whether California's statutory standards for obtaining a warrant prior to a full dependency hearing satisfy the procedural and substantive requirements of the U.S. Constitution. *See Sigal v. County of Los Angeles*, No. 18-56085, 2021 WL 4061120, at \*1 (9th Cir. Sept. 7, 2021) (unpublished) (assuming, without deciding, "that probable cause exists to remove a child when the child faces a 'substantial risk of harm'" (citing Cal. Welf. & Inst. Code § 300(b)(1))); *Olvera v. County of Sacramento*, 932 F. Supp. 2d 1123, 1150 (E.D. Cal. 2013) (holding that "[t]he issuance of the warrant to place [plaintiffs' child] in protective custody must . . . have been supported by probable cause that the circumstances in the [plaintiffs'] home endangered [the child]'s health or welfare" (citing Cal. Welf. & Inst. Code § 340(a))).    But the Parents do not challenge the constitutionality of California's standards for removal. Rather, they dispute whether the warrant was obtained through judicial deception.  We will address that claim and leave to another day the constitutional sufficiency of California's scheme. *See Marks v. Hudson*, 933 F.3d 481, 487 (5th Cir. 2019) (noting potential constitutional challenges to the Texas child removal statute but concluding that, "[w]hatever questions might be raised by this statutory language, the parties here argue the case solely on the basis

of whether an affidavit without fabrications or omissions would have supported probable cause").

## 2. Judicial Deception and DCFS's Application for Removal

We have recognized a cause of action under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments where a warrant or other authorization to seize a child was obtained through judicial deception. Indeed, "[o]ur caselaw clearly establishes that, as part of the right to familial association, parents and children have a 'right to be free from judicial deception' in child custody proceedings and removal orders." *David v. Kaulukukui*, 38 F.4th 792, 800 (9th Cir. 2022) (quoting *Greene v. Camreta*, 588 F.3d 1011, 1034 (9th Cir. 2009), *vacated in part and remanded in part*, 563 U.S. 692 (2011)). "Judicial deception" consists of either "deliberate omission or affirmative misrepresentation." *Id.* at 801 n.3. A statement can also be misleading if, although technically true, it has been so wrenched from its context that the judicial officer will not comprehend how it fits into the larger puzzle. For example, a statement uttered jokingly or sarcastically will be understood by those present one way but, when reproduced on the written page and read out of context, the statement may be understood to mean the opposite of what was said. In such a case, "the officer [has] omitted facts required to prevent technically true statements in the affidavit from being misleading." *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009). Even otherwise true observations made misleading by the omission of facts that are not themselves material may result in an affidavit that, considered as a whole, is materially misleading. "[B]y reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw . . . . [and] denude the

probable cause requirement of all real meaning." *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (internal quotation marks and citations omitted).

"To state a violation of the constitutional right to familial association through judicial deception, a plaintiff must allege '(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision.'" *David*, 38 F.4th at 801 (quoting *Benavidez v. County of San Diego*, 993 F.3d 1134, 1147 (9th Cir. 2021)). "A misrepresentation or omission is 'material' if a court 'would have declined to issue the order had [the defendant] been truthful.'" *Id.* (alteration in original) (quoting *Greene*, 588 F.3d at 1035). "Because the [Parents] appeal from a grant of summary judgment, they need only make a 'substantial showing' of the [state actors'] deliberate or reckless false statements and omissions." *Chism v. Washington*, 661 F.3d 380, 387 (9th Cir. 2011) (quoting *Liston*, 120 F.3d at 973). "'Clear proof of deliberat[ion] or reckless[ness] is not required' at the summary judgment stage." *Id.* at 387–88 (alterations in original) (quoting *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir.), *amended by* 769 F.2d 1410 (9th Cir. 1985)). "If a plaintiff satisfies these requirements, 'the matter should go to trial.'" *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) (quoting *Liston*, 120 F.3d at 972–75).

The question before us is whether the Department's Statement of Cause contains material omissions or misrepresentations such that a reasonable magistrate, informed of the true facts, would not have issued a protective custody warrant for the seizure of K.X. and G.X. We conclude that the Statement contained misrepresentations and omissions of fact and so remand to the district court.

In September 2017, DCFS filed an Application and Statement of Cause in support of a warrant to remove K.X. and G.X. from their parents. Through a series of check-the-box statements, the Department advised that there was "probable cause to believe that continuance in the home of the parent(s) . . . [wa]s contrary to the child(ren)'s welfare" because "[t]he child(ren)'s physical environment pose[d] a threat to the[ir] . . . health or safety and there [we]re no reasonable means by which the child(ren) c[ould] be protected without temporary removal."**6** The Application was accompanied by Olarte's lengthy Statement of Cause. The Statement made two critical points: First, the Parents were treating K.X. with cannabis oil without medical supervision, and second, the treatment adversely affected K.X.'s behavior at school. The Parents have alleged that this Statement contained false statements, statements taken so far out of context as to be misleading, and omissions of important facts. The Parents further allege that these inaccurate, incomplete, and omitted facts, taken together,

---

[6] We note that this language from the form misstates California law. The form requires DCFS to certify only that there is "a threat to the child(ren)'s health or safety." By contrast, the statute states that a juvenile dependency petition requires proof of "a *substantial risk* that the child will suffer[] *serious physical harm*." Cal. Welf. & Inst. Code § 300(b)(1) (emphasis added). A petition for a protective custody warrant—one to be issued in advance of a juvenile dependency hearing—likewise requires probable cause to believe that the juvenile dependency criteria are met and, further, that "[t]here is *substantial danger* to the safety or to the physical or emotional health of the child" and that such danger cannot "reasonabl[y]" be prevented "without removal." *Id.* § 340(b)(2)-(3) (emphasis added). The Findings and Orders form signed by the Superior Court judge contains similar misstatements of California law.

were material and made either deliberately or with a reckless disregard for the truth.[7]

####   a.   The Statement of Cause's claim that K.X. was not being treated by a medical professional or an autism specialist

The Parents' principal contention is that Olarte's Statement of Cause included at least one statement about their treatment of K.X. with cannabis oil that Olarte knew to be false.  In her conclusion, Olarte summed up her evidence as follows:

> Based upon my 12 years of experience as a social worker investigating over 2,500 child abuse referrals, this social worker believes that the conduct of mother Rachel Scanlon and father Steven Sawyer, which includes, but is not limited to general neglect as evidenced by the fact that mother and father are treating child, minor [K.X.'s] autism with cannabis oil and *have not consulted with a medical professional* or a professional who deals with autism, endangers the physical and emotion well-being of the child such that the

---

[7] The Parents further allege that Olarte misrepresented her conversations with them and portrayed them in a false light in her Statement of Cause. Because we hold that the misrepresentations with respect to K.X.'s medical care and her behavior at school are sufficient to require reversal, we decline to address the Parents' allegations concerning how they were depicted in the Statement.  They may renew these arguments on remand.

> children are at risk of suffering emotional or
> physical harm.

(emphasis added).[8]

We need not detain ourselves long to hold that this statement constituted a misrepresentation which a reasonable trier of fact could find was recklessly or deliberately made. *See David*, 38 F.4th at 801. Indeed, it contradicts Olarte's *own* account of her investigation. Elsewhere in her lengthy Statement, Olarte reports that Scanlon told her in her first interview that "what is important is that the oil was prescribed by a doctor." As we have discussed, that recommendation came from Dr. Peter Mendelsohn, a board-certified anesthesiologist and pain specialist. Olarte's narrative recites that "[Scanlon] forwarded a Physician's Statement & Recommendation via email" to Olarte and that "Olarte attempted to reach Dr. Peter Mendelsohn . . . but the call only rang and there [wa]s no answer." Although her investigation was inconclusive, Olarte expressed no doubts concerning the veracity of the Parents' claim that they had consulted with Dr. Mendelsohn and obtained a recommendation from him to treat K.X. with medical cannabis. Her affirmative statement that the Parents "ha[d] not consulted with a medical professional" was false, could be found material and

---

[8] As with the DCFS forms, we note that Olarte's statement misstates what DCFS had to prove under California law. While the Statement concludes merely that "the children are at risk of suffering emotional or physical harm," even a petition for juvenile dependency—which would have entitled the Parents to a hearing before their children were removed—requires proof of "a *substantial* risk that the child will suffer[] *serious* physical harm." Cal. Welf. & Inst. Code § 300(b)(1) (emphasis added).

deliberate or reckless by a reasonable jury, and is itself sufficient to reverse the district court's holding as to the Parents' judicial deception claim.

Olarte's conclusion was misleading in yet another way: She contended that the Parents "ha[d] not consulted with . . . *a professional who deals with autism*." This was contradicted elsewhere in Olarte's statement. She earlier noted having spoken with Dr. Gutierrez, K.X.'s treating pediatrician, who knew K.X. had been diagnosed with autism in 2010. Dr. Gutierrez prescribed Vayarin, an Omega-3 fatty acid, "to . . . address [K.X.'s] symptoms and balance [her] behaviors," and she had referred K.X. to a psychologist. When Olarte asked about treating K.X. with medical marijuana, "Dr. Gutierrez said that treatment ha[d] not been discussed with her. She said she herself [wa]s not very familiar with the treatment but heard, in some cases, children with epilepsy are being treated with cannabis oil. Dr. Gutierrez ha[d] not heard about autism being also treated with cannabis oil." Elsewhere, Olarte noted that Scanlon told her in the second interview that she was "giving [K.X.] the Vayarin [Dr. Gutierrez] prescribed to her."

Further belying both of Olarte's statements (regarding the lack of involvement of either a medical professional *or* one experienced with autism), the Statement of Cause reflects that the Parents told Olarte that "[K.X.] [wa]s already scheduled to meet with a pediatric[ian] specializing on [*sic*] cannabis oil"—that was Dr. Goldstein—but that she was on a year-long waiting list. All in all, the details in Olarte's report confirm that the Parents had consulted with at least two doctors—one, a pediatrician who worked with them on K.X.'s autism, and the other, a board-certified anesthesiologist and pain management specialist who recommended cannabis oil to treat her autism—and were on

an extended waiting list to see a third doctor who was known for treating autistic children with cannabis oil. That simply cannot be squared with Olarte's recommendation that K.X. and G.X. be removed because the Parents "ha[d] not consulted with a medical professional or a professional who deals with autism."

A reasonable trier of fact could find that these misrepresentations were "material to the judicial decision." *David*, 38 F.4th at 801 (internal quotation marks and citation omitted). In her Statement of Cause, Olarte characterized K.X. as being "under the influence." Similarly, the Statement relates that, in one of her meetings with the Parents, Olarte told them that K.X.'s "symptoms [we]re th[ose] of someone under the influence of drugs." When Sawyer replied that "[K.X.'s] side effects [we]re no different than the side effects of prescribed medication," Olarte "explained that prescribed medication is FDA approved and always monitored by a doctor" and suggested that K.X.'s treatment should be monitored by her pediatrician, Dr. Guitierrez.

This exchange emphasizes the materiality of the Parents' consultation with Dr. Mendelsohn. If the Parents in fact obtained medical oversight for K.X.'s treatment, it would mean that DCFS's basis for removing the children—"the fact that [the Parents] . . . [we]re treating . . . [K.X.'s] autism with cannabis oil"—was entirely legal under California law, a fact DCFS failed to mention. In the Compassionate Use Act of 1996, California declared that "seriously ill Californians have the right to obtain and use marijuana for medical purposes *where that medical use is deemed appropriate and has been recommended by a physician* who has determined that the person's health would benefit from the use of marijuana." Cal. Health & Safety Code

§ 11362.5(b)(1)(A) (emphasis added). A "serious medical condition" that may warrant treatment with medical marijuana includes "[a]ny . . . chronic or persistent medical symptom that either . . . [s]ubstantially limits the ability of the person to conduct one or more major life activities as defined in the federal Americans with Disabilities Act of 1990 [("ADA")] . . . [or] [i]f not alleviated, may cause serious harm to the patient's safety or physical or mental health." *Id.* § 11362.7(h)(12).[9] Significantly, nothing in the Compassionate Use Act restricts the use of medical marijuana to adults. *See generally* Off. of the Att'y Gen., Cal. Dep't of Just., Guidelines for the Security and Non-Diversion of Cannabis Grown for Medical Use 1, 9 (2019), https://oag.ca.gov/system/files/attachments/press-docs/MEDICINAL%20CANNABIS%20Guidelines.pdf (defining "[a] qualified patient" as "a person whose physician has recommended the use of cannabis to treat a serious illness," without setting a threshold age to qualify). Indeed, certain provisions contemplate that minors may be treated consistent with the Act. *See* Cal. Health & Safety Code § 11362.7(e) ("A primary caregiver shall be at least 18 years of age, unless the primary caregiver is the parent of *a minor child who is a qualified patient* . . . ." (emphasis added)); *id.* § 11362.755(d) (referring to "the legal guardian of a qualified patient under the age of 18").

Since California has legalized medical marijuana (including for children) when recommended by a doctor, a reasonable magistrate could not have ordered the children

---

[9] We have long recognized that autism is a condition within the scope of the ADA. *See*, *e.g.*, *Paul G. ex rel. Steve G. v. Monterey Peninsula Unified Sch. Dist.*, 933 F.3d 1096, 1098 (9th Cir. 2019); *Christopher S. ex rel. Rita S. v. Stanislaus Cnty. Off. of Educ.*, 384 F.3d 1205, 1207, 1214 (9th Cir. 2004).

removed merely because K.X. was receiving medical marijuana. Here, medical supervision separates lawful parental behavior from actionable concerns on the part of DCFS. A reasonable jury could therefore find Olarte's assertions that the Parents had not obtained supervision to be material. In sum, we find the Parents have stated a cognizable claim for judicial deception on this basis.

> b. The Statement of Cause's attribution to K.X.'s teacher of claims concerning K.X.'s behavior

The Parents also claim that Olarte mischaracterized and misattributed statements made by Alida Turner, who had been K.X.'s teacher for two years, which contributed to a materially misleading Statement of Cause. Olarte's description of her conversation with Turner was critical to DCFS's warrant application because it was the principal evidence that K.X. was in "substantial risk . . . [of] serious physical harm" from her cannabis oil treatments. Cal. Welf. & Inst. Code § 300(a). As we noted in the previous subsection, DCFS characterized K.X. as presenting "under the influence" at school. The bare fact of K.X. being "under the influence" of medical marijuana, administered on the recommendation of a doctor as authorized by the Compassionate Use Act, would not likely have been enough for a reasonable magistrate to discern a legally sufficient risk. The point of any regimen of prescribed or recommended medical substances—from Acetaminophen to Zoloft—is to come "under the influence." Whether the treatment has placed the patient at "substantial risk . . . [of] serious physical harm" is an entirely different question. The details of the "influence" of K.X.'s cannabis treatment mattered, and Turner's testimony was the cornerstone of the Statement of Cause.

Here is the relevant paragraph in its entirety:

On 09/15/17, CSW Olarte responded to Cabrillo Elementary. CSW met with [K.X.]'s teacher, Alida Turner, who said school staff reportedly smelled the scent of marijuana on [K.X.]. She herself did not smell it as [K.X.] had already consumed some orange juice when she approached her and was only able to pick up the scent of orange juice. She did, however, notice [K.X.] appeared to be under the influence. [K.X.] was giggly one moment and overly calm the next. [K.X.] stumbled around and at times and [sic] was close to falling over. [K.X.] had to be assisted, almost carried, due to her state. [K.X.]'s eyes were "droopy" and she displayed a delayed response. She added that the prior school year, [K.X.] had difficulty with her behavior, however, her behavior worsened during the summer. She described [K.X.] as becoming aggressive and self-harming. [K.X.] would throw tantrums and hit her head. She said, this year, [K.X.] seems mellow and sits out during recess. The previous year, [K.X.] would get on the tricycle and run around the yard but this year [K.X.] stares into space. [K.X.] also seems to be so affected by medication and she is unable to write her name or keep her pencil straight. She denied having any concerns the previous year. [K.X.] has good attendance

and always presents as well cared for and
well groomed.

When Turner was asked in her deposition whether she told
Olarte these things, she denied saying them.  For example,
Turner testified that she never said K.X. "appeared to be
under the influence," "had to be carried," "had a delayed
response," "stared into space," was "so affected by
medication [that] she [wa]s unable to write her name or keep
her pencil straight," or that her "eyes were droopy." [10]

Beyond denying that she made these statements to
Olarte, Turner testified that she would not have said such
things because they were untrue.  She had never seen K.X.
behave in a way that suggested she was intoxicated.  To the
contrary, Turner claimed that, thanks to the new regimen,
K.X. was "more talkative, compliant, let's say well-behaved.
She was calm."  This was in contrast to the prior year, when
K.X. would "hit herself," "hurt[] the assistants," "bang[] her
head on the floor . . . [and] the walls," "scratch others[,] and
cry . . . and scream a lot."  Turner testified that she was in
frequent contact with Scanlon, who asked for feedback on
the medication, and that she had told Scanlon, "[I]t's
working.  I can see.  I can work with [K.X.] better."  It is
difficult to see how someone who testified to these facts
would, at the same time, tell Olarte that K.X. was left semi-
catatonic owing to her use of cannabis oil.  Accordingly,
there are substantial differences between what Olarte

---

[10] Some of the statements Olarte attributes to Turner appear to have been
pulled from the referrals called into DCFS concerning K.X., which came
from an unnamed aide at the school.  Turner denied ever hearing any of
these statements from an aide or conveying such statements to Olarte.
So far as we can tell, Olarte never actually spoke with anyone at the
school other than Turner.

reported about her conversation with Turner and what Turner said she told Olarte.

There are also genuine factual disputes concerning whether Olarte properly characterized the statements that Turner asserted she *did* make during their conversation. When Turner testified that K.X. mellowed out once she started taking the medicine, intending to convey that her behavior had improved from its violent baseline, Olarte reported that the girl was "under the influence." When Turner said K.X. was giggly, but that her giggles did not increase when she started taking medical marijuana, Olarte reported that K.X. was emotionally labile: "giggly one moment and overly calm the next." And when Turner and Olarte together observed K.X. on the playground during Olarte's schoolhouse visit, they likewise came away with very different recollections. Olarte's Statement said that, "[t]he previous year, [K.X.] would get on [a] tricycle and run around the yard"—but this year, she did nothing but "stare[] into space." Turner, meanwhile, recalled telling Olarte about K.X.'s tantrums the prior year and noted that "that moment . . . was a good time to observe [K.X.] because she was playing. She liked the tricycle, and she was riding it."

"[V]iewing the evidence . . . in the light most favorable to the [Parents]," Turner's testimony strongly supports the Parents' claim that Olarte mischaracterized Turner's comments, placing them in a false light. *Nieves Martinez*, 997 F.3d at 875. A reasonable trier of fact could find that Turner's testimony casts doubt on whether Turner actually said the negative comments Olarte attributed to her in her Statement. To the extent the primary fact witness in Olarte's Statement of Cause (other than Olarte herself) did *not* report any negative behavioral effects from K.X.'s treatment, a reasonable trier of fact could find such misrepresentations

were material to the issuance of a warrant to remove the children.

\* \* \*

To recapitulate, Olarte's Statement is inconsistent with the evidence in the record in numerous respects. We find that Olarte's statements regarding the Parents' failure to obtain medical supervision *were* misrepresentations and that the statements she attributed to Alida Turner could likewise be found by a reasonable jury to be misrepresentations. Either set of statements could reasonably be held material to the magistrate's issuance of a warrant to detain the children.

As we noted above, under California law, a child becomes a "dependent" within the jurisdiction of the juvenile court only if "there is a substantial risk that the child will suffer[] serious physical harm or illness" resulting from "parental neglect." Cal. Welf. & Inst. Code § 300(a). California law further provides that a warrant to remove a child prior to a hearing cannot issue absent a showing of probable cause to believe that "[t]here is a substantial danger to the safety or to the physical or emotional health of the child" and "[t]here are no reasonable means to protect the child's safety or physical health without removal." *Id.* § 340(b)(2), (3). The Fourteenth Amendment requires at least such a showing. *Keates*, 883 F.3d at 1237–38; *Olvera*, 932 F. Supp. 2d at 1150–51. If the Parents were consulting with a doctor on K.X.'s treatment—and if the effects of that treatment on K.X.'s behavior were not the dour picture painted by the Statement of Cause—a fully informed judicial officer might well have concluded that either the California or the federal standard was not met here.

Because there are triable issues of fact as to whether the warrant application *materially* misrepresented information

and "omitted facts required to prevent . . . the affidavit from being misleading," *Liston*, 120 F.3d at 973 (citation omitted), leading to the removal of K.X. and G.X., we hold that the district court erred in granting summary judgment to defendants.  We also observe that the defendants are not entitled to qualified immunity.  The right to be free from judicial deception was clearly established prior to 2016 and so before the events of this case.  *David*, 38 F.4th at 801 ("[T]he right to be free from judicial deception in matters of child custody 'is beyond debate.'" (quoting *Hardwick v. County of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017))); *see Benavidez*, 993 F.3d at 1152; *Greene*, 588 F.3d at 1034–35; *Costanich*, 627 F.3d at 1111–12.  We therefore reverse and remand for additional consideration of the judicial deception claim.

B.  *The District Court Did Not Err in Granting Judgment on the Pleadings as to Plaintiffs' Fourth Amendment Claim Concerning G.X.'s School Interview*

The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, ensures an individual's right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV.  "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'"  *Capp*, 940 F.3d at 1059 (alteration in original) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)).  In other words, "a seizure occurs if, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Dees v. County of San Diego*, 960 F.3d 1145, 1154 (9th Cir. 2020) (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)).  Because "children possess a Fourth Amendment

right to 'be secure in their persons . . . against unreasonable searches and seizures,'" *Mann v. County of San Diego*, 907 F.3d 1154, 1164 (9th Cir. 2018) (alteration in original) (quoting U.S. Const. amend. IV), when considering what a "reasonable person" might believe, we must take into account that "children cannot be viewed simply as miniature adults," *J.D.B. v. North Carolina*, 564 U.S. 261, 274 (2011). In evaluating the Fourth Amendment rights of the child (as opposed to those of her parents), we must analyze the alleged seizure from the perspective of a child the age of the plaintiff, not that of the average adult; this is "a reality that courts cannot simply ignore." *Id.* at 277; *see Kirkpatrick*, 843 F.3d at 790–92 (considering the Fourth Amendment rights of a newborn seized from her mother at the hospital).

Social worker investigations conducted prior to removing a child from her parents fall within the ambit of state action proscribed by the Fourth Amendment. In *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999), we held that a social worker's warrantless entry into the home as part of a child abuse investigation was a "well established" Fourth Amendment violation. *Id.* at 813–14. Even if the entry "was primarily to protect the children, not investigate crime, . . . . warrants should be obtained if consent is refused." *Id.* at 817.

Temporary seizures of children at school for investigatory purposes present a more nuanced instance of this problem. The school is not the home and, when the school has its own interests, the Supreme Court has sought to "strike the balance between the schoolchild's legitimate expectations of privacy and the school's equally legitimate need to maintain an environment in which learning can take place." *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985); *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S.

364, 370–71 (2009). Here, we are not confronted with questions around seeking a balance between the interests of the child and those of her school but, rather, between the interests of the child and those of the state in securing the welfare of children at home. We have some history in this area. Although in general "[t]he Fourth Amendment protects a child's right to be free from unreasonable seizure by a social worker," *Dees*, 960 F.3d at 1154 (citing *Kirkpatrick*, 843 F.3d at 790–91), the details surrounding the investigation have proven critical.

In *Greene*, 588 F.3d 1011, Nimrod Greene was arrested on suspicion of sexually abusing his friends' seven-year-old son. The Oregon Department of Human Services also learned that Nimrod may have abused one of his daughters, nine-year-old S.G. Bob Camreta, a social worker, together with a sheriff's deputy, went to S.G.'s school, where they interviewed her for two hours. The investigation was inconclusive, and no charges were filed against Nimrod with respect to S.G. S.G.'s mother subsequently brought a Section 1983 action on S.G's behalf against Camreta and the deputy. We rejected Camreta's claim that the balancing of interests in which the Court engaged in *T.L.O.* provided the appropriate standard. *Greene*, 588 F.3d at 1023–24. We concluded that "'[c]onstitutional claims based on searches or seizures by public school officials relating to public school students therefore call for an analysis . . . that is different from that [for searches or seizures by caseworkers].'" *Id.* at 1024 (alterations in original) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 607 (2d Cir. 1999)). Because of the "presence of law enforcement objectives . . . ., 'disentangling [the goal of protecting a child's welfare] from general law enforcement purposes' becomes particularly 'difficult.'" *Id*. at 1027 (second alteration in original) (quoting *Roe v. Tex.*

*Dep't of Protective & Regul. Servs.*, 299 F.3d 395, 406–07 (5th Cir. 2002)).   We observed that, "[a]ny time a government official suspects that a child has been abused, investigation of that abuse for child protection purposes may uncover evidence of a crime" and, even if the caseworker is only conducting a welfare check, she is not precluded from sharing the information she finds with law enforcement officers.  *Id.* at 1029.  In the end, we held that, "[a]t least where there is . . . direct involvement of law enforcement in an in-school seizure and interrogation of a suspected child abuse victim, . . . . the decision to seize and interrogate [the child] in the absence of a warrant, a court order, exigent circumstances, or parental consent [i]s unconstitutional."  *Id.* at 1030 (footnotes omitted).  Nonetheless, we concluded that this right had not been clearly established at the time of Camreta's investigation and so granted qualified immunity to him and the deputy.  *Id.* at 1033.

The Supreme Court granted certiorari and vacated *Greene*'s Fourth Amendment holding on mootness grounds. However, it left intact the qualified immunity determination. *Camreta*, 563 U.S. at 698, 714 n.11 ("We leave untouched the Court of Appeals' ruling on qualified immunity and its corresponding dismissal of S.G.'s claim because S.G. chose not to challenge that ruling.").  The only surviving portion of our decision in *Greene* is that the Fourth Amendment "right of minor children to be free from unconstitutional seizures and interrogations by social workers [w]as not . . . clearly established" as of August 2015.  *Capp*, 940 F.3d at 1059; *see Greene*, 588 F.3d at 1033.

We have not gone so far since *Greene*.[11]  In *Dees*, a social worker interviewed a nine-year-old girl, L.G., in connection with an investigation of sexual abuse.  Although ostensibly performing a welfare check, the social worker believed a criminal investigation was ongoing.  The interview took place in an administrative office and "lasted only five minutes."  *Dees*, 960 F.3d at 1154.  There were conflicting accounts as to whether the minor was upset by the interview but no evidence that the social worker tried to "coerce or otherwise intimidate" her.  *Id.* at 1151, 1153–54.  L.G.'s mother sued on her behalf for violations of her Fourth Amendment rights.  A jury returned a verdict for the social worker, but the district court subsequently granted plaintiffs' renewed motion for judgment as a matter of law.  *Id.* at 1150–51.  We reversed, finding that the court had "inappropriately weighed the facts."  *Id.* at 1154.  To that end, we identified three facts that distinguished *Dees* from other cases:  First, no law enforcement officer was present; second, the interview was brief; and third, L.G. was nine, suffered from cognitive difficulties, and may not have felt free to end the conversation.  *Id.* at 1154–55.  From these factors (which cut in different directions), we concluded that L.G.'s circumstances were sufficiently different from our prior cases that the district court had erred in finding that the minor was unreasonably seized "*as a matter of law*."  *Id.* at

---

[11] In *Capp*, we held that plaintiffs had failed to demonstrate a Fourth Amendment violation stemming from social workers' schoolhouse interviews of two minors, then ages nine and eleven.  940 F.3d at 1059.  There, however, the record was unclear as to parental consent.  *Id.*  Hence, we could not "conclude that [the minors] . . . were impermissibly restrained," absent additional information regarding "whether the interviews were conducted without either parent's permission . . ., the length of the interviews, or the specific circumstances [thereof]."  *Id.*

1155 (emphasis in original).  Nevertheless, we observed that it was

> at least arguable whether a nine-year old girl with cognitive disabilities, called into the administrative office of her school by a woman who she knew had the authority to disrupt her family's life, would feel empowered to leave or could have consented to the discussion.

*Id.* at 1156.  We affirmed the district court's alternative holding to grant a new trial.  *Dees* suggests that a different set of facts *could* transform a social worker interview into a Fourth Amendment seizure, but it does not firmly establish that principle.

At least three circuits, the Sixth, Seventh, and Tenth, have weighed in on this question, but we think that the results are a mixed bag.  The strongest case for G.X. is *Schulkers v. Kammer*, 955 F.3d 520 (6th Cir. 2020).  In that case, social workers followed up on a report that a mother of five children who had recently given birth tested positive for opiates.  Two social workers interviewed each of the older children, ages 8, 9, 9, and 13, at their public schools.  The interviews lasted about thirty minutes, and the children were asked pointed questions about their mother's drug and alcohol use.  *Id.* at 530.  The Sixth Circuit held that the social workers were entitled to qualified immunity against the Fourth Amendment claims, but it proceeded to resolve the constitutional claim on the merits.  The court concluded that, "[a]t a minimum, a social worker must have reasonable suspicion of child abuse before conducting an in-school interview without a warrant or consent."  *Id.* at 538.  That

conclusion, however, appears to be dicta: The court accepted as true that, at the time of the interviews, the social workers knew that the drug test had been a false positive and that they lacked "*any* plausible suspicion that the . . . children were subjected to abuse or neglect." *Id.* (emphasis in original); *see also Barber v. Miller*, 809 F.3d 840, 845 (6th Cir. 2015) (holding the "Fourth Amendment right to avoid warrantless, in-school interviews by social workers on suspicion of child abuse not to have been clearly established in January 2011" and declining to rule on the constitutional merits of the claim).

The social worker's awareness that her investigation was baseless also distinguishes the Tenth Circuit's decision in *Jones v. Hunt*, 410 F.3d 1221 (10th Cir. 2005). There, a social worker and a police officer interviewed a 16-year-old for several hours, knowing that there was "no legitimate basis . . . for detaining [the] child." *Id.* at 1229; *see id.* at 1231 ("A social worker who lacks any legitimate justification for seizing a child, but nonetheless seizes the child and demands, in direct contravention of a court order, that she enter the custody of her abusive father, would clearly know that his conduct is unconstitutional." (footnote omitted)). *Jones* contrasts with an earlier decision of the Tenth Circuit, in which a social worker interviewed a nine-year-old who was suspected of having sexually assaulted a five-year-old. *Doe v. Bagan*, 41 F.3d 571, 574 (10th Cir. 1994). The social worker in that case conducted the interview alone at school over the course of about ten minutes. The Tenth Circuit held that the social worker did not violate the child's Fourth Amendment rights: "[T]his brief detention by a social services caseworker [wa]s not of constitutional dimension. . . .[,] [since it] was a de minimis interference with Doe's liberty, insufficient at that stage to

trigger constitutional liberty concerns." *Id.* at 575. In a lengthy footnote, the court expanded on its analysis:

> The seizure here was justified at its inception because a victim of child abuse had identified Doe as her abuser; a ten minute interview with a social services caseworker was reasonably related in scope to determining Doe's role in the incident. This seizure, therefore, was reasonable as a matter of law. . . . This was simply an interview by a caseworker incident to an ongoing child abuse investigation.

*Id.* at 574–75 n.3 (citation omitted).

In *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), the Seventh Circuit held that a twenty-minute interview of an eleven-year-old conducted by a caseworker in the presence of a uniformed police officer violated the boy's Fourth Amendment rights. What is unusual about *Heck* is that the court held that the interview was "presumptively unreasonable," *id.* at 513, because the child was attending a private school, which was the constitutional equivalent of an interview in the home, *id.* at 512–13. The court thus held a Wisconsin statute, which authorized social workers to interview children at any location (other than the home) if the agency thought the child "[wa]s in need of protection or services," unconstitutional as applied to private school students. *Id.* at 502, 515–16. But it also granted the defendants qualified immunity. *Id.* at 516–17; *see also Michael C. v. Gresbach*, 526 F.3d 1008, 1018 (7th Cir. 2008) (holding that, in light of *Heck*, a social worker who

interviewed minors at a private school was not entitled to qualified immunity).

We cannot discern a clear rule from these decisions, and the plain import of our own is that Olarte is entitled to qualified immunity as to claims stemming from her schoolhouse interview of G.X. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Our decisions are inconclusive. That conclusion is only reinforced by our review of decisions from other circuits. The only one with language broad enough to constitute some warning to Olarte is the Sixth Circuit's decision in *Schulkers*—decided three years *after* the events in this case.

In a case where we conclude that the defendant is entitled to qualified immunity because the constitutional right was not clearly established at the time of the events, we have the discretion to reach the constitutional question to "promote[] the development of constitutional precedent." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). As the Court has observed, "if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals." *County of Sacramento v. Lewis*, 523 U.S. 833, 840–41 n.5 (1998).

Nonetheless, this matter is left to our "sound discretion." *Pearson*, 555 U.S. at 242.

At oral argument, counsel for the Parents candidly urged us to address the merits of the constitutional claim, even if only to provide future guidance. Although we are sympathetic, we decline the invitation to resolve the Fourth Amendment contours of social worker interviews of children at school. There are a number of factors that have to be balanced in these cases. *See Demuth v. County of Los Angeles*, 798 F.3d 837, 839 (9th Cir. 2015) ("[I]n the Fourth Amendment context, . . . 'the constitutional standard—reasonableness—is always a very fact-specific inquiry.'" (quoting *C.B. v. City of Sonora*, 769 F.3d 1005, 1026 (9th Cir. 2014) (en banc))). These include: the age of the child; whether the child suffers from any cognitive or emotional conditions; where the interview took place; whether the parents knew in advance of the interview and consented or objected to the interview; the nature of the claim being investigated, including whether the claim may result in criminal charges; whether the nature of the claim is such that the child may be in physical danger; whether the child is considered a possible victim, a perpetrator, or a witness; the length of the interview; whether law enforcement is present; whether the child is allowed to have present a trusted adult, such as a teacher, counselor, or other school administrator; whether the child felt coerced or intimidated; and whether the child has the option of stopping the interview. *See Dees*, 960 F.3d at 1149–50 (noting the County of San Diego's guidelines for social worker interviews).

Some of the facts in this case are troubling, while others point to the reasonableness of the interview. At the time of Olarte's schoolhouse interview of G.X., the latter was only

five years old—roughly half the age of, and more impressionable than, for example, even the nine-year-old in *Dees*. *See id.* at 1154. Her Parents did not know that she would be interviewed and may not have consented. Olarte had no information that G.X. was in any immediate danger, nor other grounds for believing that the Parents might have violated any criminal law. But the investigation was still in an early stage, and Olarte was properly concerned that G.X. might have access to her sister's medical marijuana. There are also numerous questions about Olarte's interview that have not been briefed and that might be relevant to resolving the Fourth Amendment question. The record suggests that Olarte interviewed G.X. alone and for a very short time, but it is not crystal clear on either point. We know little about the circumstances under which G.X. was brought to the interview and whether she knew that a teacher or other trusted adult could be in the room with her or at least nearby. Although Olarte's interview of G.X. doubtlessly effected a seizure, we would want additional facts before we concluded that it represented an *unreasonable* one. Given the range of views on this question, *compare Schulkers*, 955 F.3d at 538 ("[A] social worker must have reasonable suspicion of child abuse before conducting an in-school interview without a warrant or consent."), *with Bagan*, 41 F.3d at 575 (holding that a "brief detention by a social services caseworker" does not violate the Fourth Amendment), we will not address the Fourth Amendment question on this record. We therefore affirm the district court's grant of judgment on the pleadings as to the schoolhouse interview of G.X.

C. *The District Court Erred in Granting Summary Judgment for Defendants on Plaintiffs' IIED Claim*

The Parents allege it was erroneous for the district court to dismiss the IIED claim as "inextricably intertwined" with

their other claims. To succeed on an IIED claim under California law, a plaintiff must establish "(1) that the defendant's conduct was outrageous, (2) that the defendant intended to cause or recklessly disregarded the probability of causing emotional distress, and (3) that the plaintiff's severe emotional suffering was (4) actually and proximately caused by the defendant's conduct." *Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004) (citation omitted). The district court dismissed the Parents' IIED claim for the same reason as their judicial deception claim: It found that "[d]efendants met their burden of showing that the warrant package did not contain material misrepresentations" and, therefore, that "the violation of the [P]arents' and K.X.'s constitutional rights based on removal of K.X. fail[ed]." *Scanlon*, 2021 WL 2420164, at *7. Because we have reversed on the judicial deception claim, we must reverse that holding as well.

On remand, the district court should consider evidence beyond the judicial deception claim that might support a finding of IIED. As evidence of outrageous state conduct, the Parents' complaint cites the "interview of G.X. at the school," "wrongful removal and continued detention of both minor Plaintiffs," "false statements and misrepresentations to the juvenile court," and "unlawful medical and/or mental health examinations" of G.X. and K.X. Their IIED claim also incorporates all prior paragraphs of the complaint, which include additional facts from which a jury could find IIED. For example, the Parents complain that the children were placed in separate foster homes despite Scanlon's request that they be kept together. G.X. was placed in a foster home even though Scanlon gave DCFS contact information for a family that could take her temporarily. DCFS also never arranged for the Parents to visit their

children.  This evidence may be relevant to the Parents' IIED claim.

We therefore reverse and remand the IIED claim for additional consideration.

D. *The District Court Erred in Granting Summary Judgment for Defendants on Plaintiffs'* Monell *Claim*

The Parents contend that DCFS has "an unofficial policy of encouraging its social workers to omit exculpatory information from warrant applications and refusing to adequately train them about their constitutional obligations." The Parents assert that this failure to train constitutes a *Monell* violation.  The defendants respond that the Parents' *Monell* claim fails for lack of an underlying constitutional violation.

We have held that "[p]arents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis*, 202 F.3d at 1136–37 (collecting cases).  In light of our disposition on the judicial deception claim, the defendants' position is not viable.  But the question remains whether the Parents can state a *Monell* claim.  The district court concluded they could not, crediting a DCFS witness who said that the Department's practice in preparing removal applications is to include mitigating facts. For the reasons we elaborate, this is not a sufficient basis to deny the Parents' *Monell* claim on summary judgment.

To sustain their *Monell* claim, the Parents must show that the action that caused their constitutional injury was part of an "official municipal policy of some nature." *Kirkpatrick*, 843 F.3d at 793 (quoting *Monell*, 436 U.S. at 691).  There are four criteria: "(1) [The Parents] had a constitutional right of which [they] were deprived; (2) the municipality had a

policy; (3) the policy amounts to deliberate indifference to [their] constitutional right; and (4) 'the policy is the moving force behind the constitutional violation.'" *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (quoting *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). We have also observed three ways a plaintiff can satisfy *Monell*'s policy requirement: The municipal government acts pursuant to an express official policy, the government maintains a longstanding practice or custom, or the act was committed or ratified by an official with policy-making authority. *Id.* at 973–74. Official nonfeasance can constitute a *Monell* violation when the municipality in effect "has a policy of inaction and such inaction amounts to a failure to protect constitutional rights." *Mortimer v. Baca*, 594 F.3d 714, 722 (9th Cir. 2010) (quoting *Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004)).

This is not our first occasion to consider *Monell* liability as it pertains to a county's child-removal policy. Unlike the warrant-based seizure at issue here, in *Kirkpatrick*, social workers took a newborn from the hospital without securing a warrant. In evaluating the validity of this seizure, we started from our "well-settled" position that "a child [can]not be removed without prior judicial authorization absent evidence that the child [i]s in imminent danger of serious bodily injury." *Kirkpatrick*, 843 F.3d at 792 (citing, *inter alia*, *Rogers*, 487 F.3d at 1295, and *Wallis*, 202 F.3d at 1138). We concluded that the social workers there had time to obtain a judicial warrant, although we granted them qualified immunity. Turning to the *Monell* claim, we asked whether we could "trace the social workers' unconstitutional removal to a systemic failure to train [social workers] to obtain a warrant before seizing a child." *Id.* at 793. We found that there was evidence that the county had "no policy

or procedures," either "for obtaining warrants before removing children from parental custody, or for training its social workers to recognize that a warrant may be required." *Id.* at 796. We held that "the municipality's 'inadequacy [was] so likely to result in the violation of constitutional rights' that a jury could reasonably find § 1983 liability without needing a pattern of violations" from which to do so. *Id.* at 796–97 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). We therefore reversed the grant of summary judgment for the county on plaintiffs' *Monell* claim.

Here, DCFS operated under a more formal policy than the one at issue in *Kirkpatrick*, removing the children pursuant to a warrant. The Application and Statement of Cause that Olarte prepared to obtain the removal warrant references our decision in *Wallis* "and its progeny" on its opening page. A section captioned "Request for Authorization for Removal" directs the preparing social worker to indicate whether, in her "professional opinion[,] . . . the child(ren) should be detained" pursuant to "Welfare and Institutions Code § 300 pending a Welfare and Institutions Code § 319 hearing because there is *probable cause* to believe that continuance in the home of the parent(s) . . . is contrary to the child(ren)'s welfare." From there, the social worker must identify the source of the purported harm from among a series of options. Here, Olarte indicated that "[t]he child(ren)'s physical environment poses a threat to the child(ren)'s health or safety and there are no reasonable means by which the child(ren) can be protected without temporary removal from the physical custody of the parents or guardians," language that duplicates that of Welfare and

Institutions Code § 340(a).[12]   Olarte checked another box referring the court to her "attached declaration," which contained "additional information supporting the need for protective custody."   More than merely referencing the relevant standards, DCFS's Application and Statement of Cause thus requires social workers to vet the validity of a proposed removal against the requirements of probable cause and California state law.

Despite DCFS's nominal compliance with federal and state standards, there is evidence in the record from which a jury could find that the Department's policy governing the preparation of warrant applications is insufficient *in practice* to protect the constitutional rights of parents like these. Specifically, there is evidence that DCFS maintains a practice of omitting exculpatory information from petitions for removal in a manner tantamount to an official "policy of inaction." *Mortimer*, 594 F.3d at 716 (citation omitted).  To be sure, some DCFS employees testified that supervisors ensure statements of cause contain mitigating information by reviewing and directing social workers to insert "relevant" details where absent.  But many employees reported never receiving training on the constitutional requirement to include such information.  Indeed, several witnesses testified that there was *no* requirement.  Witness Fred Shook—a 24-year DCFS veteran with policy-drafting responsibility—

---

[12] As we previously noted, *see supra* note 6, the form does not accurately state California's statutory standards under either Cal. Welf. & Inst. Code § 300 or § 340.  Nevertheless, the Parents have argued only "that the County had an unofficial policy, practice, and failure of training that encouraged social workers to make false representations and omit exculpatory information in warrants submitted to the juvenile court for the removal of children."   Hence, we do not address how these inaccuracies bear on the Parents' *Monell* claim.

testified that the Department has no written policy requiring social workers to include mitigating facts in warrant applications.  And defendant Hashizume testified that the general practice of DCFS social workers was to include only information that would encourage the court to separate parents from their children.  When asked if she was "trained by DCFS that the information that is included in a petition should be *exclusively limited* to information that would support the proposition that the court should take jurisdiction over the minor child" (emphasis added), Hashizume replied, "Yes."

Drawing all inferences in the Parents' favor, as we must on a motion for summary judgment, a jury could conclude that DCFS's practices are inadequate to protect against constitutional violations such as those now claimed.  We therefore remand the *Monell* claim to the district court for additional consideration.

E. *The District Court Did Not Abuse Its Discretion by Repeating Jury Instructions to a Confused Juror*

Finally, the Parents argue that the district court committed instructional error in its response to a jury question concerning whether to credit verbal testimony in the absence of documentary evidence that the Parents had purchased a lockbox for the cannabis oil.  Properly considered, this claim is not about the jury instructions *per se* but about the court's response to a juror note.

The parties dispute whether the Parents properly objected to this issue in the proceedings below.  We find that they did.  "An objection to a jury instruction 'need not be formal' . . . ." *Hunter v. County of Sacramento*, 652 F.3d 1225, 1230 (9th Cir. 2011) (quoting *Norwood v. Vance*, 591 F.3d 1062, 1066 (9th Cir. 2010)).  We have previously

found proper objections when counsel moved for a new trial, *Shorter v. Baca*, 895 F.3d 1176, 1183 (9th Cir. 2018); sent a letter to the court, *Dunlap*, 878 F.3d at 798; or proposed an alternate instruction for the jury, *Hunter*, 652 F.3d at 1231.

Here, the Parents' counsel properly objected to the district court's response to Juror Note No. 4. Counsel disputed the defendants' proposed supplemental instructions and renewed his objection to the court's response to the juror's question—re-reading instructions 1, 3, 5, 8, and 24—after it did so. Counsel pointed out that the principal issue suggested by Juror Note No. 4—potential confusion among the jury over how to weigh oral versus documentary evidence—may not have been clarified by the court's instruction (and indeed, that further confusion may have resulted). To that end, counsel requested an additional instruction that the jury may believe testimony about the purchase of a lockbox even without testimony regarding a receipt, which the court refused. These actions were sufficient to preserve the objection for appeal. Counsel having properly objected, we review for abuse of discretion, rather than plain error. *Compare Johnson*, 351 F.3d at 993, 995 (reviewing for abuse of discretion—although defendant "did not object to the [relevant] instruction"—the district court's decision to respond to a jury question "by simply referring the jury to the instructions that had already been given"), *with C.B.*, 769 F.3d at 1016 (reviewing a district court's failure to give a requested jury instruction for plain error absent a timely objection).

The general rule is the jury must decide the case on the basis of the evidence before it. It "may not enlist the court as its partner in the factfinding process," so "the trial judge must proceed circumspectly in responding to inquiries from the jury." *Johnson*, 351 F.3d at 994 (quoting *United*

*States v. Walker*, 575 F.2d 209, 214 (9th Cir. 1978)). However, so long as the court does not usurp the jury's responsibility, "[w]hen a jury makes explicit its difficulties[,] a trial judge should clear them away with concrete accuracy." *Crowley v. Epicept Corp.*, 883 F.3d 739, 750 (9th Cir. 2018) (quoting *United States v. Anekwu*, 695 F.3d 967, 986 (9th Cir. 2012)).

Our precedents suggest that there is a delicate balance to be struck between giving the jury additional instructions and directing it to the instructions that have already been given. For example, in *McDowell v. Calderon*, 130 F.3d 833 (9th Cir. 1997), we concluded that repeating legally correct jury instructions was insufficient to clarify a juror's confusion because "[t]here is no point in reiterating language which has failed to enlighten the jury." *Id.* at 838 (quoting *People v. McDowell*, 763 P.2d 1269, 1287 (Cal. 1988) (Broussard, J., concurring in part and dissenting in part)). However, in *Arizona v. Johnson*, we determined that addressing a juror's question about the capacity to consent while in custody by "referring the jury to the instructions they had already been given" did not constitute an abuse of discretion. 351 F.3d at 995. Similarly, in *Crowley*, the jury asked whether the timing of a predicate event was relevant to the plaintiffs' "failure to do what [the] contract required." 883 F.3d at 750. We concluded that the district court did not commit reversible error when it responded to the jury's question by referring "back to the instructions already given and the evidence presented at trial." *Id.* at 751. *Crowley* held that when "the court's original instructions provide a correct statement of the law and 'generally address[] the jury's question,' a district court acts 'within its discretion by simply referring the jury to the instructions they had already

been given.'"  *Id.* at 750–51 (quoting *Johnson*, 351 F.3d at 995).

The facts of this case more closely mirror *Johnson* and *Crowley* than *McDowell*.  Here, the jury appears to have been confused as to the sufficiency of verbal testimony regarding a lockbox in the absence of documentary evidence to that effect.  However, while the parties disagree as to whether the district court's response adequately answered the juror's question, neither disputes that the proffered jury instructions were legally correct.  Counsel for the Parents argued that the question showed that the jury was confused about whether plaintiffs had the burden of proving the existence of a receipt for the lockbox.  But nothing in the court's response changed the burden of proof described in the original jury instructions.  In addition, the court's response admonished the jury that witness testimony—including Sawyer's testimony that he had purchased a lockbox—was evidence that it could consider.  Taken together, these facts show "it is more probable than not" that the jury's verdict was not affected by the court's response to Juror Note No. 4.  *Dunlap*, 878 F.3d at 798 (internal quotation marks and citation omitted).  We conclude that the district court's response did not constitute an abuse of discretion.

## IV. CONCLUSION

We affirm the district court's ruling that plaintiffs' Fourth Amendment claim regarding the schoolhouse interview of G.X. is barred by qualified immunity.  We also affirm the district court's response to Juror Note No. 4.  We reverse the judgment of the district court as to the judicial deception, *Monell*, and IIED claims and remand for further proceedings.  Each side shall bear its own costs.  *Exxon*

*Valdez v. Exxon Mobil*, 568 F.3d 1077, 1081 (9th Cir. 2009). The Parents' motions to file a reply brief under seal and for additional time in which to do so (Dkt. Nos. 64, 68–69) are hereby granted.

**AFFIRMED in part, REVERSED AND REMANDED in part.**